Opinion by Judge RAWLINSON; Concurrence by Judge BETTY B. FLETCHER; Partial Concurrence and Partial Dissent by Judge KLEINFELD.
RAWLINSON, Circuit Judge:
Petitioner Milo Stanley (Stanley) was convicted by a jury of first-degree murder of his wife and five-year-old daughter. The court sentenced Stanley to life in prison for the murder of his wife and to death for the murder of his daughter. Stanley’s conviction and sentence were affirmed by the Arizona Supreme Court on direct appeal and his state petitions for post-conviction relief were denied. He subsequently filed a petition for writ of habeas corpus in the district court and now appeals the district court’s denial of that petition.
Stanley asserts three grounds for relief. First, Stanley contends that his Miranda[1] rights were violated when officers ignored his attempted invocation of those rights and continued interrogating him until they secured a confession. Second, Stanley posits that trial counsel rendered ineffective assistance during the guilt phase of trial by failing to present readily available evidence to support an insanity defense and a lack of premeditation defense. Third, Stanley argues that trial counsel rendered ineffective assistance during the penalty phase of trial by failing to investigate and present readily available mitigating evidence. It is the last ground that gives us pause, as we take note of Justice O’Connor’s remarks in 2001 that prompted the New York Times to editorialize that the “legal representation afforded most indigent defendants in capital cases” is woefully inadequate. Editorial, Justice O’Con- *615 nor on Executions, N.Y. Times, July 5, 2001, at A16.
Because we are convinced that defense counsel’s performance did not prejudice Stanley during the guilt phase of the trial, we AFFIRM the district court’s denial of Stanley’s habeas petition as to the first two grounds. However, because Stanley’s allegations raise serious questions and a color-able claim regarding the adequacy of counsel during the penalty phase of the trial, we REVERSE and REMAND that portion of the decision to allow the district court to conduct an evidentiary hearing. We simply cannot in good conscience continue to send men to their deaths without ensuring that their cases were not prejudiced by inadequate legal representation at any phase of the proceedings.
I.

BACKGROUND

A. Stanley’s Interrogation and Confession

Stanley contacted the police on the evening of June 19, 1986, to report his wife and five-year-old daughter missing. See State v. Stanley, 167 Ariz. 519, 809 P.2d 944, 946 (1991). The next afternoon, with the consent of both Stanley and his father, officers searched the pair’s auto repair shop, where Stanley’s wife’s sisters had reported discovering bloodstains and a spent shell casing in the wife’s car. See id. at 946-47. While officers searched the shop, Stanley was asked and agreed to accompany Officer Saravo (an investigator) to his office at the county building to be interviewed regarding the disappearance of his wife and daughter. See id. at 947. Stanley was specifically informed that he was not under arrest and was not a suspect.
Saravo initially approached the interview as a follow-up to a missing persons report, asking questions to reconstruct the family’s activities on the night of the disappearance. He also asked questions to determine where they might have gone. However, there were indications early in the hour-long interview that Saravo suspected Stanley’s involvement.
Approximately fifteen minutes into the interview, Saravo began to ask Stanley questions related to the officers’ discovery of blood in his wife’s car. Approximately twenty minutes into the interview, Saravo turned to questions directed toward Stanley’s use of his gun in connection with the car. Approximately twenty-five minutes into the interview, Saravo increased the pressure, but still did not reveal his suspicions. (“Can you tell me any reason why there would be blood on the outside of your vehicle?”); (“Can you tell me any reason why there would be blood on the inside of your vehicle?”); (“I want to tell you right now that there is blood on the vehicle.”).
About thirty minutes into the interview, after advising Stanley of his Miranda rights, Saravo sought permission to search Stanley’s apartment, to which Stanley consented. Before reading the Miranda warnings, Saravo assured Stanley, ‘You weren’t under arrest and you’re not under arrest at this time ...” He explained that the rights were being read “just because we’re going to ask you for a consent to search at this point.” After reading Stanley his rights, Saravo again stated, “you’re not under arrest at this time ...”
Stanley granted consent to the search approximately thirty-six minutes into the interview and was allowed to leave to get a drink. When Stanley returned, Saravo began to point out the holes he saw in the story Stanley had related. Finally, approximately forty-five minutes into the interview, Saravo confronted Stanley with *616 his suspicion: “Do you really think somebody actually surprised you (sic) wife at the shop, took your gun and put her in that car and took her out and killed her and brought the car back?” After Stanley answered in the affirmative, Saravo replied, “I don’t think that could have happened,” and then continued, “I think if that happened, if that in fact is what happened, that person almost had to have been you.” When Saravo then asked Stanley who the perpetrator would have “had to have been,” Stanley answered, “[m]e.” At that point Stanley said, “I think I better talk to a lawyer. I don’t want to say any more.” After confirming that Stanley did not wish to answer questions, Saravo indicated that he was concluding the interview and stopped the recording. He did not tell Stanley that he was free to leave.
After an unknown period of time elapsed, Saravo turned the tape recorder back on. He purported to recognize Stanley’s invocation of his rights (“You have requested to talk to an attorney, you don’t have to talk to me.”), then confronted Stanley with additional evidence and resumed questioning. (“It appears now that very strongly that your wife has met some foul play, understand?”); (“There’s nothing more that you would like to do to locate your wife and child?”). At least ten minutes passed with Stanley sobbing and Saravo coming and going from the room before the tape ran out. Subsequently, Stanley apparently confessed to the killing.
Our colleague in dissent assiduously catalogs every heinous detail of this gruesome crime. See Dissenting Opinion, pp. 629-30. There is no doubt that the facts of this case are repulsive. But that is true for every case where the death penalty is imposed. If the resolution of this case rested on the relative heinousness of the offense, we would have no quarrel with our colleague in dissent. However, our charge is to look at the merits of the legal issues raised rather than to focus on the degree to which we are repulsed by the inevitably grisly details of the case. Indeed, our precedent leaves no doubt that the heinous nature of the underlying offense should not be the determining factor. See Stankewitz v. Woodford, 365 F.3d 706, 723 (9th Cir.2004) (holding that “counsel’s failure to present mitigating evidence can be prejudicial even when the defendant’s actions are egregious”); see also Douglas v. Woodford, 316 F.3d 1079, 1091 (9th Cir.2003) (“The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable.”) (citations omitted).

B. Admission of the Confession

In denying Stanley’s contention that his confession was wrongfully admitted into evidence, “[t]he trial court determined there was neither a Miranda nor an Edwards [v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] violation because Stanley was not in custody at the time of Saravo’s questioning.” Stanley, 809 P.2d at 948. On direct appeal, the Arizona Supreme Court agreed, stating that, “[w]hether one is in custody is determined objectively: Under the circumstances, would a reasonable person feel deprived of his freedom of action? Factors indicative of custody include: (1) whether the objective indicia of arrest are present; (2) the site of the interrogation; (3) the length and form of the investigation; and, (4) whether the investigation had focused on the accused.” Id. (citations omitted). Applying these factors, the court concluded that Stanley was not in custody and, therefore, Miranda warnings were not required. See id. On that basis, the court rejected Stanley’s argument that, under Edwards, questioning should have ceased when he attempted to invoke his Miranda rights. See id. at 948-49.

*617
C. Dissociative Reaction and Insanity

Following his confession, Stanley was arrested. The next day he was seen by Dr. Hammitt, the jail psychiatrist. Among other things, Stanley told Dr. Hammitt that at the time of the killing “he experienced the sensation that he was watching like he wasn’t even there.” “He told [Dr. Hammitt] that he flew off the wall and shot them.”
The dissent represents that Dr. Ham-mitt “concluded that Stanley was ... not even remorseful.” Dissenting Opinion, p. 630. This characterization considerably overstates Dr. Hammitt’s report. As the dissent notes, Stanley “cried a great deal” during the meeting with Dr. Hammitt, which observation is somewhat inconsistent with a complete lack of remorse. In fact, Dr. Hammitt described Stanley as “quite emotionally distraught,” and “anguished, sobbing [and] unable to relate appropriately.” In addition, Dr. Hammitt did not report that Stanley lacked remorse. Her precise statements were that “[n]othing [Stanley] said indicated to me any degree of remorse per se” and that Stanley “never volunteered any comments about remorse ...” That is a far cry from a definitive statement that Stanley lacked remorse.
Prior to trial, defense counsel sought to exclude the notes regarding Dr. Hammitt’s interview of Stanley (the Hammitt interview) on the basis of doctor-patient privilege. The court granted the motion. Defense counsel did not provide information regarding the Hammitt interview to the defense mental health experts who evaluated Stanley.
Upon learning of this information after trial, the defense experts declared that the information would have changed their opinions regarding Stanley’s mental state at the time of the killings. Had they been provided with the Hammitt interview, both experts would have testified that Stanley most likely suffered from a dissociative reaction at the time of the killings, making it unlikely that he acted with premeditation.
II.

STANDARDS OF REVIEW

“We review de novo the district court’s denial of a petition for a writ of habeas corpus.” Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir.2005), as amended (citation omitted). The district court’s factual findings are reviewed for clear error. See id. We review the district court’s determination that a petitioner is not entitled to an evidentiary hearing for abuse of discretion. See Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007).
Under the Antiterrorism and Effective Death Penalty Act of 1996 (AED-PA), ... a federal court can grant an application for a writ of habeas corpus on behalf of a person held pursuant to a state-court judgment if the state-court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.
Yarborough v. Alvarado, 541 U.S. 652, 655, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (citation and internal quotation marks omitted). “[C]learly established law as determined by [the Supreme Court] refers to the holdings, as opposed to the dicta, of [the Supreme Court’s] decisions ...” Id. at 660-61, 124 S.Ct. 2140 (citation and internal quotation marks omitted). “[Courts] look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.” Id. at 661, 124 S.Ct. 2140 (citation and internal quotation marks omitted).
*618 The court may grant relief under the “unreasonable application” clause if the state court correctly identifies the governing legal principle from [the Supreme Court’s] decisions but unreasonably applies it to the facts of the particular case. The focus of [this] inquiry is on whether the state court’s application of clearly established federal law is objectively unreasonable, and [the Supreme Court] has stressed ... that an unreasonable application is different from an incorrect one.
Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).
III.

DISCUSSION

A. Admission of Stanley’s Confession

To be entitled to relief based on an alleged violation of his Miranda rights, Stanley must show that the state court’s determination that he was not in custody when he attempted to invoke his right to silence and right to have an attorney present during questioning either was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Stanley has failed to make this showing and, therefore, is not entitled to relief on this claim.
Under clearly established federal law, Miranda warnings are required “only where there has been such a restriction on a person’s freedom as to render him ‘in custody.’ ” Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (citations omitted).[2] The “ultimate inquiry” underlying the question of custody “is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” Id. (citation and alteration omitted). To answer this question, the reviewing court looks to the totality of the circumstances, id. at 322, 114 S.Ct. 1526, that might “affect[ ] how a reasonable person in that position would perceive his or her freedom to leave.” Id. at 325, 114 S.Ct. 1526.
On direct review, the Arizona Supreme Court identified eight facts which, together, rendered Stanley’s interview non-custodial.[3] First, the investigation that led officers to question Stanley was initiated by Stanley’s report that his wife and daughter were missing. See Stanley, 809 P.2d at 948. Second, the interview took place at the county building rather than the police station. See id. Third, Stanley voluntarily agreed to the interview. See id. Fourth, he was told that he was not under arrest and was not a suspect. See id. Fifth, he was not disarmed of his hunting knife. See id. Sixth, the investigation was focused “on a search for missing persons ..., not on a homicide.” Id. Seventh, during the interview Stanley left the office, unaccompanied, to get something to drink and use the restroom. See id. Eighth, there was no display of weapons by police, and no use of physical force or threatening language. See id.
*619 Stanley contends that the state court failed to address the increasingly accusatory nature of the questioning to which he was subjected. This argument lacks merit. An officer’s expressed suspicions may be relevant to the issue of custody. See Stansbury, 511 U.S. at 325, 114 S.Ct. 1526. However,
[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.... In sum, an officer’s ... beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer’s views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.
Id. (emphasis added).
Although it is somewhat troubling that the court failed to explicitly address the accusatory nature of Saravo’s questioning, the omission does not render the court’s application of federal law unreasonable. In the context of determining whether a state court has reasonably applied clearly established federal law to reach its determination, “the range of reasonable judgment can depend in part on the nature of the relevant rule.” Yarborough, 541 U.S. at 664, 124 S.Ct. 2140. “The custody test is general,” id. at 665, 124 S.Ct. 2140, and “[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Id. at 664, 124 S.Ct. 2140 (citation omitted); see also Oregon v. Mathiason, 429 U.S. 492, 494-95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) (holding that a suspect was not in custody despite being informed that he was a suspect and confronted with fabricated evidence linking him to the crime). Because the state court delineated and weighed factors comparable to those the Supreme Court has considered, cf. Yarborough, 541 U.S. at 664, 124 S.Ct. 2140, we conclude that the Arizona Supreme Court reasonably applied federal law in determining that Stanley was not in custody when he confessed.

B. Ineffective Assistance of Counsel: Guilt Phase

To establish a violation of his Sixth Amendment right to effective assistance of counsel, Stanley must show that (1) counsel’s performance fell below an “objective standard of reasonableness” and (2) he was prejudiced by this deficient performance. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If we conclude that the petitioner fails to satisfy one of the Strickland prongs, we need not address the other. See id. at 697, 104 S.Ct. 2052. Because Stanley failed to demonstrate that he was prejudiced by trial counsel’s alleged shortcomings, he is not entitled to relief.
To establish prejudice, Stanley “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. (emphasis added). Where, as here, there is a contention that trial counsel’s performance was deficient due to failure to present evidence to support a defense, there must be a reasonable probability that the omitted evidence would have raised a reasonable doubt in jurors’ minds as to guilt. See id. at 695, 104 S.Ct. 2052.
*620 Stanley contends that he was prejudiced by counsel’s failure to present evidence revealed in the Hammitt interview to his experts. According to Stanley, the experts could then explain the significance of that interview to the jury to establish an insanity or diminished capacity defense. However, Arizona law bars the admission of expert testimony regarding the mental state of the defendant at the time of the offense. See State v. Mott, 187 Ariz. 536, 931 P.2d 1046, 1050 (1997). As a result, Arizona courts have “consistently refused to allow psychiatric testimony to negate specific intent.” Id. at 1051 (citations omitted). “Arizona does not allow evidence of a defendant’s mental disorder short of insanity either as an affirmative defense or to negate the mens rea element of a crime.” Id.; see also Clark v. Arizona, 548 U.S. 735, 756, 779, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (holding that exclusion of expert testimony regarding diminished capacity does not violate due process). This is a longstanding rule in Arizona. See Mott, 931 P.2d at 1050.
Much of the proffered testimony upon which Stanley relies falls within the scope of Arizona’s bar. For example, Dr. Bindelglas, one of the expert witnesses, stated in an affidavit:
Without regard to whether Stanley was insane under the requirements of Arizona law at the time the shooting of his wife and daughter occurred, there was a very real issue as to whether Stanley could premeditate his actions if they occurred during a Dissociative Reaction .... Had I been asked, I would have testified that a Dissociative Reaction is a spontaneous, involuntary event and so there were very substantial doubts that Stanley premeditated his actions, regardless of whether he met the legal test for insanity in Arizona.
Dr. Bindelglas declared that access to the Hammitt interview would have provided corroboration for his conclusion that Stanley had suffered a dissociative reaction. Similarly, another expert witness, Dr. Garcia-Bunuel, stated in an affidavit that the Hammitt interview generated an “opinion that at the time of the killing of his wife and daughter, it is highly probable that Mr. Stanley was suffering from a Dissociative Reaction.”
Expert testimony that Stanley suffered a dissociative reaction at the time of the killing would not have been admissible to challenge premeditation. See Mott, 931 P.2d at 1051 (“Arizona does not allow evidence of a defendant’s mental disorder short of insanity either as an affirmative defense or to negate the mens rea element of a crime.”). No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir.1999).
Stanley attempts to re-frame the issue to avoid Arizona law limiting the admissibility of expert testimony on the issue of premeditation by describing the testimony as addressing “character traits.” An expert witness may testify as to “a person’s continuing general personality trait” (e.g., general tendency to act without reflection), but may not testify as to “a person’s probable state of mind at the time of the offense.” State v. Ortiz, 158 Ariz. 528, 764 P.2d 13, 18 (1988) (citation omitted). Stanley’s reliance on this proposition is misplaced because the testimony of Drs. Bindelglas and Garcia-Bunuel would not be that Stanley had a “character trait of impulsivity,” as argued by Stanley. Rather, Dr. Bindelglas would have testified that “a Dissociative Reaction is a spontaneous, involuntary event and so there were very substantial doubts that Stanley premeditated his actions, regardless of whether he *621 met the legal test for insanity in Arizona.” This testimony directly conflicts with Arizona’s limitation on expert testimony. See id. at 18 (“An expert witness may not testify specifically as to whether a defendant was or was not acting reflectively at the time of a killing.”) (citation, alteration and emphasis omitted). Likewise, Dr. Garcia-Bunuel’s testimony would have focused impermissibly on the likelihood of a dissociative reaction “at the time of the killing of his wife and daughter.”
In his subsequent declaration, in addition to opining that Stanley likely suffered a dissociative reaction, Dr. Garcia-Bunuel stated his “further opinion that as a result of [his Dissociative Reaction], it is highly probable that Stanley met the criteria for the M’Naughten standard of insanity.” Testimony to this effect would not have been barred, as Arizona allows expert testimony that a defendant meets the legal definition of insanity. See Mott, 931 P.2d at 1051. However, we conclude that the absence of testimony to this effect did not prejudice Stanley due to the overwhelming evidence that he was sane. Indeed, two of the other experts who testified at trial expressly disagreed with Dr. Garcia-Bunuel on this point.
Finally, despite the fact that trial counsel successfully petitioned the court to exclude Dr. Hammitt’s interview from admission into evidence, Stanley argues now that Dr. Hammitt’s interview should have been offered into evidence. Although observation evidence offered by an expert is admissible to rebut the prosecution’s evidence of mens rea, see Clark, 548 U.S. at 760, 765 n. 34, 126 S.Ct. 2709,[4] we conclude that Stanley was not prejudiced by trial counsel’s failure to introduce the Hammitt interview into evidence. It is true that Dr. Hammitt made statements that could support a lack-of-premeditation defense. For example, she described Stanley as “quite emotionally distraught,” “anguished, sobbing,[and] unable to relate appropriately.” However, it is unlikely that Dr. Hammitt’s observation evidence would have overcome the substantial evidence of premeditation presented at trial.[5]
The district court specifically referenced the particulars of the shootings (“evidence of similarly-placed contact wounds”), the testimony of Officer Wright, and Stanley’s conduct after the shootings, as evidence “presenting] challenges to a defense based on absence of premeditation.” At trial, there was evidence that Stanley’s wife was shot three times: once to the top of her head, with the barrel of the gun pressed against her skull; once in the upper lip, from a distance of less than one foot; and once behind the ear, from a distance of three or more feet. The evidence also indicated that his daughter was shot once: to the top of the head, with the *622 barrel of the gun pressed against her skull. Officer Wright testified that Stanley said he shot his daughter “because she had seen what he had done.” This evidence is sufficient to show a lack of prejudice to Stanley because the Hammitt interview would not have changed the outcome given the evidence of premeditation.

C. Ineffective Assistance of Counsel: Sentencing Phase

Stanley asserts that trial counsel was ineffective during the sentencing phase because he “failed to offer the wealth of mitigating evidence that was at his disposal.” There appear to be two parts to this argument. First, Stanley contends that counsel failed to “call a single mental health expert to testify at sentencing, despite the fact that all of the experts ... agreed that Stanley’s mental capacities were impaired at the time of the crime,” and failed to offer testimony “regarding Stanley’s mental health, his low IQ, or to explain, from a scientific standpoint, how the drug and alcohol abuse could have affected his actions on the night of the crime.”[6] Second, Stanley argues that trial counsel’s failure to investigate the significance of the Hammitt interview or provide that information to the mental health experts constituted ineffective assistance of counsel.
During the guilt phase, the experts’ testimony focused on whether Stanley satisfied the legal standard of insanity, not on the broader effects of his substance abuse. Specifically, in his report to the court, Dr. Garcia-Bunuel stated that, “[h]ad [Stanley] not been under the influence of a combination of alcohol, marijuana and cocaine, the alleged crimes would not have been committed in that his ability to conform his conduct to the requirements of the law would have been very seriously impaired.” At trial, Dr. Garcia-Bunuel testified that, “Defendant at the time of the commission of the alleged offense was under the influence of alcohol, marijuana, cocaine. He was not psychiatrically ill ... [and] was able to appreciate the difference between right and wrong as applied to his actions.” Similarly, Dr. Bindelglas concluded in his report to the court that, “[a]t the time of the offense ... the defendant’s ability to think clearly, reflect on the consequences of his actions and to control his activity were significantly impaired.” Neither expert testified regarding the cumulative effect of substance abuse on Stanley. But while the expert testimony during the guilt phase was clearly limited in its scope, Stanley provides no evidence to suggest what additional testimony would have been given by the experts if called during the sentencing phase to explain the cumulative effects of Stanley’s chronic substance abuse.
Stanley argued in his state petition for post-conviction relief that trial counsel rendered ineffective assistance by failing to call mental health experts during the sentencing phase of trial. However, the state court did not address this issue.
“[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.” Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002) (citations and footnote reference omitted). Nevertheless, because Stanley failed to present evidence to support his contention, other than the evidence presented at trial, he has failed to establish that counsel rendered ineffective *623 assistance in failing to present evidence to explain the cumulative effects of Stanley’s chronic substance abuse. See Cox v. Del Papa, 542 F.3d 669, 681 (9th Cir.2008) (“Without any specification of the mitigating evidence that counsel failed to unearth, [the petitioner’s] claim must fail.”) (citation omitted).
Stanley has a stronger argument regarding use of the Hammitt interview as mitigation evidence during the sentencing phase. We pause for a moment to note our dissenting colleague’s disturbing argument that the passage of time should somehow militate against habeas relief. See Dissenting Opinion, pp. 628-29. Indeed, Stanley has met all deadlines in filing for post-conviction relief, including the restrictive AEDPA deadlines. After the Arizona Supreme Court affirmed Stanley’s conviction in 1991, Stanley filed a preliminary petition for post-conviction relief in the trial court. The trial court took nearly five years to deny the petition even though it did not hold a hearing. Less than three weeks after the Arizona Supreme Court’s denial of Stanley’s state petition, Stanley filed his federal habeas petition. The district court took more than eight years to deny the petition. Stanley then promptly appealed to the Ninth Circuit. For the dissent to suggest that the lengthy process, none of it due to a lack of diligence on Stanley’s part, is reason to deny him an evidentiary hearing violates every sense of fairness and justice. Moreover, the increasing frequency with which innocent people have been vindicated after years of imprisonment counsels a different approach. See Samuel R. Gross et al., Exonerations in the United States 1989 through 2008, 95 J. Crim. L. & Criminology 523, 523-24 (2004) (noting that from 1989 through 2003 exonerated individuals “spent more than 3,400 years in prison for crimes for which they should never have been convicted ... ”). We note this phenomenon, not to imply that Stanley is innocent, but to emphasize that it is never too late to correct an injustice.
We also point out that because the district court addressed whether an evidentiary hearing was warranted, that issue is squarely presented on appeal. See Sechrest v. Ignacio, 549 F.3d 789, 810 n. 10 (9th Cir.2008). Finally, it is important to keep in mind that our decision in no way affects Stanley’s conviction, and it may not affect his sentence. All this decision does is give Stanley the opportunity to establish whether his counsel’s failure to fully inform the defense mental health experts undermines confidence in the sentence of death imposed. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
On post-conviction review, the Superior Court of the State of Arizona held that trial counsel’s decision to withhold the Hammitt interview was a reasonable tactical decision because “the possible harm to the defense which could be caused by use of Dr. Hammitt’s interview outweighed the possible benefits the use of the interview might produce.”[7] State v. Stanley, No. CR 11909, at 7 (Ariz.Super.Ct. May 19, 1997). The court concluded that, “with regard to the issue of sentencing, Dr. Hammitt’s interview could have undermined the claim of a disassociative (sic) reaction ...” Id. Without holding an evidentiary hearing or making any findings regarding the investigation underlying trial counsel’s decision, the court found that “[Stanley’s] determination not to waive the physician-client privilege was a matter of reasoned trial strategy and does not pres *624 ent a colorable claim that trial counsel was ineffective for failing to do so.” Id.
Where a petitioner has not failed to develop the factual basis of his claim in State court, as required by 28 U.S.C. § 2254(e)(2), an evidentiary hearing on a habeas corpus petition is required where the petitioner’s allegations, if true, would entitle him to relief, and the petitioner has satisfied the requirements of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). See Insyxiengmay v. Morgan, 403 F.3d 657, 670 & n. 6 (9th Cir.2005). A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim and therefore satisfies § 2254(e)(2).[8] See Estrada v. Scribner, 512 F.3d 1227, 1235 n. 7 (9th Cir.2008). Under Townsend, an evidentiary hearing is justified where, as here, “the material facts were not adequately developed at the state-court hearing.” 372 U.S. at 313, 83 S.Ct. 745. Therefore, Stanley is entitled to an evidentiary hearing on his ineffective assistance claim if his allegations, if proved, would entitle him to federal habeas relief. See Insyxiengmay, 403 F.3d at 670. The standard we apply to determine whether the alleged facts would entitle Stanley to relief is the deferential standard of 28 U.S.C. § 2254. See Estrada, 512 F.3d at 1235.
“It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.” Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir.1999), as amended. The emphasis of the sentencing phase of trial is different than that of the guilt phase. See id. (“The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts.”) (citation omitted); see also Wallace v. Stewart, 184 F.3d 1112, 1117 n. 5 (9th Cir.1999) (“[T]he lawyer’s burden might differ at the guilt phase from that at the penalty phase ... ”). Even where the sentencer is aware of facts underlying the defendant’s mitigation case, trial counsel may not necessarily rest on these facts. See Caro, 165 F.3d at 1227 (clarifying that although the jury had information regarding the defendant’s background, it did not “have the benefit of expert testimony to explain the ramifications of[this background] on Caro’s behavior”).
Even if expert testimony regarding Stanley’s mental state at the time of the crime would not have been admissible to challenge premeditation, as discussed above, it would have been admissible and highly relevant at sentencing. Evidence that might not rise to the level of defense of a crime may nonetheless be important mitigating evidence. See Frierson v. Woodford, 463 F.3d 982, 993-94 & n. 12 (9th Cir.2006).
In Wallace, we held that trial counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions. See Wallace, 184 F.3d at 1117. “A lawyer who knows of but does not inform his expert witnesses about essential pieces of information going to the heart of the ease for mitigation does not function as ‘counsel’ under the Sixth Amendment.” Id. (citation and alteration omitted). Although trial counsel’s lack of effectiveness was not prejudicial at the guilt phase, during sentencing, “where mitigation evidence may well be the key to avoiding the death penalty,” our analysis differs. Id. (citation *625 omitted). Indeed, if the district court were persuaded that rather than being a cold-blooded murderer, Stanley “snapped” and killed his wife and daughter, it is not at all unlikely that he could have avoided a death sentence. See, e.g., State v. Carlson, 202 Ariz. 570, 48 P.3d 1180, 1197-98 (2002) (en banc) (reducing a death penalty to life in prison without the possibility of parole based upon mitigating circumstances). As in Wallace, we conclude that Stanley “has made out a prima facie case” of ineffective assistance of counsel. See Wallace, 184 F.3d at 1118.
In the dissent’s view “all that we are talking about” is supplementation of the defense experts’ “testimony with Stanley’s remark that ‘he felt like he was watching’ and like he wasn’t really there.’ ” Dissenting Opinion, p. 632. We beg to differ. Both defense experts agreed that the information regarding Stanley’s apparent dissociative state would have completely changed their testimony in Stanley’s favor and would have permitted a credible argument against the alleged depravity that is so prominent in our dissenting colleague’s discussion.
To warrant habeas relief, Stanley is also required to demonstrate that he was prejudiced by counsel’s failing. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Prejudice is established by a showing “that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. Stanley need only show “a probability sufficient to undermine confidence in the outcome.” Id. “In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.” Stankewitz v. Woodford, 365 F.3d 706, 723 (9th Cir.2004) (citations omitted).
Stanley’s death sentence was based on the following aggravating circumstances: (1) Stanley was convicted of one other homicide in connection with the killing of his daughter; (2) at the time of the murder, Stanley was an adult and his daughter was under 15 years of age; and (3) Stanley committed the murder of his daughter in a depraved manner. These were balanced against the following mitigating circumstances: (1) Stanley had no prior felony record; (2) he “was an adequate family man;” (3) he made attempts to address his drug and alcohol problems; (4) “he had exhibited very little violent behavior or spousal abuse;” and (5) he was “remorseful for his crimes.” Stanley, 809 P.2d at 954. The court considered and rejected Stanley’s assertion that “his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law” was “significantly impaired” at the time of the killings. Id. at 956.
The statements of Drs. Bindelglas and Garcia-Bunuel undermine confidence in the state court’s balancing. First, they introduce additional residual doubt regarding Stanley’s culpability for both killings by casting additional doubt on his premeditation. They also weigh against the court’s finding that Stanley killed his daughter in a depraved manner, because they suggest that he was not in control at the time of the killings. In relation to the finding of depravity, a dissociative reaction would explain how Stanley could have been so intentional about concealing his wrongdoing after the killing, yet not have been intentional about the killing itself. Most significantly, with the support of the Ham-mitt interview, the statement of the experts would have supported a finding that Stanley could not “conform his conduct to the requirements of the law.” Therefore, we conclude that, if proved, Stanley’s allegation would establish that he was preju *626 diced by trial counsel’s failure to investigate and develop a mitigation case based on the Hammitt interview.
We cannot agree with our dissenting colleague that defense counsel’s failure to inform the mental health experts of Stanley’s statements to Dr. Hammitt was a reasonable tactical decision at the sentencing phase of the trial. It was entirely reasonable to keep this evidence out at the guilt phase because Stanley was still challenging the admissibility of his confession and testimony regarding his statements to Dr. Hammitt would have established an independent admission of guilt. However, that consideration evaporated once Stanley was convicted. Moreover, because the admission of expert testimony regarding the mental state of the defendant at the time of the offense is barred in Arizona, any attempt to introduce the expert testimony during the guilt phase would have been futile. Just the opposite was true for the sentencing phase. That was the time for defense counsel to muster all available mitigation evidence. Testimony from the defense experts would have countered Dr. Hammitt’s testimony on a two-to-one basis and explained how Stanley could have acted in such a depraved manner at the time of the killings.
Because Stanley’s allegation supported by expert testimony would entitle him to federal habeas relief, the district court abused its discretion in denying his petition without an evidentiary hearing. See Wallace, 184 F.3d at 1118 (remanding for an evidentiary hearing under similar circumstances).
IV.

CONCLUSION

For the foregoing reasons, we AFFIRM the district court’s denial of the petition for a writ of habeas corpus as to the Miranda claim and as to the claim of ineffective assistance during the guilt phase, and REVERSE the district court’s denial as to the claim of ineffective assistance during the sentencing phase. We REMAND for an evidentiary hearing on that claim. In so doing, we express no opinion as to the ultimate merits of Stanley’s petition.
AFFIRMED in part, REVERSED in part, and REMANDED.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Although Stansbury was decided after the Arizona Supreme Court's 1991 decision in State v. Stanley, the principles it discusses were clearly established federal law based on Supreme Court decisions announced prior to 1991. See Stansbury, 511 U.S. at 322-25, 114 S.Ct. 1526.

. On habeas review we examine the last reasoned decision from the state courts. See Mejia v. Garcia, 534 F.3d 1036, 1042 (9th Cir.2008).

. It would have been appropriate for Dr. Hammitt to offer observation evidence because she interviewed Stanley shortly after the murders were committed. See State v. Wright, 214 Ariz. 540, 155 P.3d 1064, 1068 (2007) (noting that "Observation evidence includes evidence of a defendant's behavior, statements, and expressions of belief around the time of the offense.”) (citation omitted) (emphasis added).

. Premeditation requires a showing of actual reflection prior to the killing; the decision to kill must "be more than just a snap decision made in the heat of passion.” State v. Thompson, 204 Ariz. 471, 65 P.3d 420, 427 (2003). Premeditation may be proved through either direct or circumstantial evidence. See id. at 428. However, it is usually proved by circumstantial evidence. See id. “[T]he time needed for reflection is not necessarily prolonged, and the space of time between the intent[knowledge] to kill and the act of killing may be very short. It is the act of premeditation and not the length of time available that determines the question.” Id. at 428-29 (internal quotation marks omitted).

. Despite Stanley’s argument on appeal, in the district court he confined his challenge to counsel's failure to offer the testimony of experts regarding his impairment due to substance abuse at the time of the offense. We limit our review to the issue raised in the district court. See Gallego v. McDaniel, 124 F.3d 1065, 1072 n. 7 (9th Cir.1997).

. The Superior Court rejected his claim on the merits, and the Arizona Supreme Court summarily denied review. Thus, the Superior Court's decision is the last reasoned decision of the state courts.

. In his state petition for post-conviction relief, Stanley sought an evidentiary hearing. His petition was denied without a hearing.