Opinion by Judge McKEOWN; Partial Concurrence and Partial Dissent by Judge BERZON.
OPINION
McKEOWN, Circuit Judge:
We embark upon this opinion with deja vu, the feeling that we have been here before, but with the knowledge that we will likely be here again. We have entertained, usually at the last minute, a number of challenges to Arizona’s execution protocol. No court has determined the constitutionality of Arizona’s current death penalty protocol, adopted in January 2012, yet we have been asked to address individual provisions of the protocol in the abstract, without a constitutionally firm base. Further complicating our task, in certain respects, the actual procedures followed during individual executions have not been consistent; instead, in the intervening two months since we issued Towery v. Brewer, 672 F.3d 650 (9th Cir.2012), there is uncertainty as to how the next execution will be carried out. The State continues to cling to its discretion, all the while urging us— during oral argument in the waning hours before execution — to trust that it will exercise its discretion in a constitutionally permissible manner. The State’s insistence “on amending its execution protocol on an ad hoc basis — through add-on practices, trial court representations and acknowledgments, and last minute written amendments — leav[es] the courts with a rolling *1071 protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions.” Id. at 653. Review of death penalty cases is a grim and difficult undertaking, even without these complications.
Background
Arizona death-row inmates Robert Charles Towery, Robert Henry Moormann, Pete Rovogich, Thomas Arnold Kemp, Milo McCormick Stanley, and Samuel Villegas Lopez brought this action under 42 U.S.C. § 1983, asserting that the Arizona Department of Corrections’ (the “ADC”) execution protocol violates the Eighth Amendment.[1] Lopez, one of the named plaintiffs with an impending execution date, moved the district court for a preliminary injunction against the ADC’s use of its current lethal injection protocol. The district court denied relief and Lopez appealed. We affirm.
In Towery v. Brewer, we considered an almost equivalent challenge to Arizona’s current execution protocol by another named plaintiff in this case. In light of the extensive prior opinions, we will not repeat the chronology and background. See id. at 654-55; see also Dickens v. Brewer, 631 F.3d 1139 (9th Cir.2011). Lopez’s challenge, in effect, picks up where Towery left off.[2]
In the district court, Lopez alleged that: 1) the ADC’s medical procedures for inserting IV catheters in condemned prisoners violates his Eighth Amendment rights; 2) the ADC’s January 25, 2012, amendment to Department Order 710 (the “2012 Protocol”) violates his right to equal protection under the Fourteenth Amendment; and 3) the ADC’s execution protocol violates his rights of access to counsel and the courts.
Lopez moved for a preliminary injunction to enjoin his execution to allow for litigation of these claims. The district court considered the evidence in the record and, without holding an evidentiary hearing, denied the request for a preliminary injunction.
The district court held that Lopez had not presented a substantial likelihood of success on the merits regarding his claim that the 2012 Protocol facially violates the Eighth Amendment. Lopez claimed that the ADC’s actions surrounding the insertion of IV catheters in condemned prisoners demonstrates an objectively intolerable risk of harm, even where a one-drug protocol is used instead of a three-drug protocol. The district court held that the mere presence of pain and discomfort resulting from the placement of IV lines did not constitute “an objectively intolerable risk of harm” and that some pain was an inescapable consequence of death.
Lopez also claimed that the 2012 Protocol violates his right to equal protection because each of the prisoners executed since the adoption of the Protocol has been treated differently with respect to IV placement and that these variances affected the risk of pain to which each was subjected. Because individualized and changing factors may impact IV placement and because use of a femoral catheter is no more likely to create a risk of cruel and unusual punishment than the use of a peripheral catheter, the district court concluded that Lopez failed to raise serious questions on the merits of his equal protection claim.
*1072 Finally, the district court upheld the prohibition on in-person non-contact visitation with the condemned’s attorney after 7:00 a.m. on the day of the scheduled execution. It found the prohibition proper because communication with counsel by telephone is still permitted past 7:00 a.m. The district also determined that Lopez is not entitled to have counsel observe the IV-placement procedure.
Analysis
On appeal, Lopez challenges four aspects of the district court’s denial of the preliminary injunction: 1) application of the “serious questions” test; 2) the conclusion that the 2012 Protocol does not violates Lopez’s Eighth Amendment rights; 3) the conclusions regarding the ADC’s restrictions on in-person non-contact counsel visits; and 4) the decision not to hold an evidentiary hearing. We review this denial of a preliminary injunction for abuse of discretion. Lands Council v. McNair, 537 F.3d 981, 986 (9th Cir.2008) (en banc). An abuse of discretion will be found if the district court based its decision “on an erroneous legal standard or clearly erroneous findings of fact.” Id. We note that in this appeal Lopez did not advance the argument offered by the dissent, namely a due process challenge based on unfettered discretion and transparency.
I. Preliminary Injunction Standard
The district court appropriately articulated the legal principles governing the grant of a preliminary injunction and applied these principles to the limited facts presented by Lopez. A preliminary injunction is “an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.” Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam) (citation omitted). To obtain preliminary injunctive relief, Lopez must demonstrate that: 1) he is likely to succeed on the merits of such a claim; 2) he is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in his favor; and 4) that an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). As we emphasized in Towery, these principles apply even in the context of an impending execution. 672 F.3d at 657 (citing Hill v. McDonough, 547 U.S. 573, 583-84, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006)).
Under the “serious questions” variation of the test, a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir.2011). The elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another. “ ‘[S]erious questions going to the merits’ and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.” Id. at 1135.
Lopez takes issue with the district court’s analysis, arguing that the court failed to balance the four Winter factors and did not consider whether Lopez presented serious questions going to the merits of the claims. The district court, however, articulated the Winter standard and discussed each of the elements. Although the court’s discussion of irreparable harm, the balance of equities, and the public interest is brief, the court did engage with *1073 each of these three factors, and thus did not apply an incorrect legal standard. See United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir.2009) (en banc) (a court abuses its discretion if it fails to identify and apply the correct legal rule).
To the extent Lopez argues that the “serious questions going to the merits” consideration is a separate and independent analysis from the court’s assessment of Lopez’s likelihood of success on the merits, Lopez misunderstands our precedent. See M.R. v. Dreyfus, 663 F.3d 1100, 1108 (9th Cir.2011) (articulating preliminary injunction standard in terms of likelihood of success on the merits or serious questions going to the merits). Because the district court did not err in determining that Lopez failed to demonstrate a likelihood of success on the merits, it follows that Lopez also failed to raise serious questions going to the merits.
II. Eighth Amendment Claim — Placement of IV Lines
The Eighth Amendment to the Constitution prohibits the infliction of “cruel and unusual punishments,” not punishment itself. Part of Lopez’s ultimate punishment — a sentence of death — is the execution process itself. Lopez challenges Arizona’s procedures for conducting executions, specifically the placement of the IV lines, claiming that they present an intolerable risk of harm rendering the process unconstitutional.
To prevail on an Eighth Amendment claim “there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.” Baze v. Rees, 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (quotation marks omitted). Lopez’s argument that the ADC is not “subjectively blameless” for its actions is insufficient; instead, the appropriate benchmark is whether the ADC’s procedures create “an objectively intolerable risk of harm” that precludes a finding that the prison officials were subjectively blameless. In other words, “[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual.” Id.
Towery’s recent execution is the primary basis of Lopez’s claim. During the execution, which started at 9:52 a.m., the ADC spent approximately thirty minutes, and made at least six punctures, unsuccessfully attempting to place IV catheters in both of Towery’s arms near his elbows. The ADC’s records document that “[a]fter multiple attempts of the left and right peripheral — (approximately 4 in right — 2 in left), IV Team Leader recommended right femoral as primary and left peripheral as back-up.” According to attorney testimony, “[d]uring Mr. Towery’s last words, he also said that he should have gone left and he went right. He went right when he should have gone left. He then went on to say he made ‘mistake, after mistake after mistake.’ Based on my discussions with Mr. Towery, this phrase meant that there were problems or he was hurt during the insertion of the catheters.”
At this point, the Director of the ADC called the Arizona Attorney General’s Office to “provide[ ] an update regarding the IV process.” The Team Leader’s recommendation was then attempted, and the “[r]ight femoral was successful; left peripheral was unsuccessful.” After further discussion between the Director and the Team Leader, the “[r]ight hand peripheral” was chosen as the back-up catheter site. This attempt was successful at 10:59 a.m., approximately an hour after the process began.
*1074 Lopez claims that this sequence of events, along with other recent executions conducted by the ADC, demonstrate that he may be subjected to an unconstitutional level of pain during his execution. The district court held that “Lopez has not cited any legal authority or alleged any facts that bring into question the prior conclusion in West that the Eighth Amendment is not offended by administration of lethal chemicals through a femoral central line. Nor is there any persuasive or even colorable reason to think that placement of a peripheral IV line in a prisoner’s hand, while possibly more uncomfortable than other peripheral sites, poses an objectively intolerable risk of severe pain that qualifies as cruel and unusual.” In addition, “[wjhile undoubtedly disquieting to a condemned inmate awaiting execution, repeated efforts to set IV lines do not, in and of themselves, suggest malevolence from Defendants, extreme pain, or even unnecessary pain.”
We acknowledge, as demonstrated by the evidence, that there can be some pain and discomfort associated with the placement of IV lines and that, depending on the individual, such placement can be difficult from time to time. An inmate might also experience some pain from the administration of the lethal drugs through a relatively smaller vein. The relevant inquiry, however, is whether placement of the peripheral line in the hand, the femoral catheter, and the series of abortive IV placement attempts, either individually or in combination, lead to an objectively intolerable risk of pain. Lopez has not documented that they do. The record does not support, with any likelihood, the conclusion that the pain Towery purportedly suffered establishes an “objectively intolerable” risk of pain for Lopez, as required under the Eighth Amendment. See Baze, 553 U.S. at 50, 128 S.Ct. 1520. Our sister circuits have taken a similar view. See Raby v. Livingston, 600 F.3d 552, 558-61 (5th Cir.2010) (upholding Texas lethal injection protocol where evidence of problems with inserting IVs); Cooey v. Strickland, 589 F.3d 210, 217-18, 224, 233-34 (6th Cir.2009) (upholding Ohio protocol despite evidence of problems inserting IV); Emmett v. Johnson, 532 F.3d 291, 303, 306-08 (4th Cir.2008) (upholding Virginia protocol despite problems with IV lines).
At this stage, we credit Lopez’s characterization of the Towery execution, as the State offered nothing to the contrary. The somewhat increased pain suffered by Towery attendant to his execution was therefore a single, isolated incident, which “alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a ‘substantial risk of serious harm.’ ” Baze, 553 U.S. at 50, 128 S.Ct. 1520 (citation omitted).[3] The isolated nature is underscored by the fact that both Moormann’s and Kemp’s executions were completed without similar difficulties. Because Lopez does not demonstrate a likelihood of success on the merits, the district court did not abuse its discretion.
Lopez next argues that the increased pain is avoidable if qualified individuals are hired to place the IVs.[4] The Director admitted in December 2011 that “he conducted the last five executions with full knowl *1075 edge that at least one of the Medical Team members did not hold a medical license and did not administer IVs in his current employment.” West v. Brewer, No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at *6 (D.Ariz. Dec. 21, 2011). Our decision in Towery explained that the 2012 Protocol, as amended by the State’s representation and commitments to this court, addresses this issue. The state represented, and we accepted, that “‘relevant experience,’ as used in Paragraph 1.2.5.1 of the 2012 Protocol, means that IV Team members must have no less than the training that is traditionally given for people to be licensed to place IVs. We view this representation as a binding one that cabins the meaning of ‘appropriately trained’ and ‘relevant experience’ in the context of the 2012 Protocol.” Id. at 658 (emphasis added). We reaffirm this holding, and note also that the ADC committed during oral argument that trained professionals, in this ease a licensed physician and nurse, constitute the IV Team for Lopez’s execution.
Nonetheless, Arizona’s actions come perilously close to losing safe-harbor protection under Baze. The 2012 Protocol does not provide for any time-limit with respect to the siting of IV lines, whereas the protocol blessed in Baze had a one-hour time limit. Compare 2012 Protocol, Attach. D, § E, with Baze, 553 U.S. at 45, 128 S.Ct. 1520. This limitation was tested with the siting of Towery’s IV lines, which took almost an hour. Although this isolated circumstance does not, in itself, create a serious question going to the merits, the inability of the class of condemned prisoners to procure details about the execution process is troubling. This lack of access is compounded by the State’s touting of the public nature of the execution, while concurrently curtailing transparency by shrouding the IV-siting process in a cloak of secrecy.
Recent exercises of the Director’s discretion give us further cause for concern. For example, detailed execution logs have given way to vague generalities about the execution. The “Continuous Correctional Log” related to West’s execution provides minute-by-minute detail regarding the insertion of the IV lines.[5] In contrast, the log for Towery’s execution simply concludes, for a 36-minute time period, that “[a]fter multiple attempts of the left and right peripheral — (approximately 4 in right — 2 in left), IV Team Leader recommended right femoral as primary and left peripheral as back-up.” And, when questioned about the Director’s exercise of his discretion, the State’s basic argument boils down to a conclusory statement that the Director is presumed to exercise his discretion in a constitutionally permissible manner. While the State correctly claims the Director may order that an execution attempt be aborted, it cannot explain what circumstances, if any, would trigger such an order. Although we uphold the district court’s decision, we caution, yet again, that Arizona’s ad hoc approach risks going beyond Baze’s safe harbor. Towery, 672 F.3d at 653.
A. Equal Protection Claim — Disparate Treatment
Lopez’s equal protection claim is that Arizona treats inmates differently and *1076 that such differences result in unconstitutional disparate treatment. As we noted in Towery, the state’s decision as to how to administer the chemicals “may well depend on individualized and changing factors such as the availability of particular people to participate in the execution, the supply of drugs available to the State at a given time, and the condition of the prisoner’s veins.” Id. at 661. For the same reasons that a similar claim failed in Towery, the district court held that it fails here as well.
The district court noted that at the time of our decision in Towery, the ADC had utilized either peripheral or femoral (or both) IV lines in carrying out each of the previous 26 executions by lethal injection. The district court found that the use of a femoral catheter is no more likely to create a risk of cruel and unusual punishment than the use of a peripheral catheter and held that Lopez had not raised serious questions or shown a likelihood of success on the merits of his equal protection claim.
Lopez points to our language in Towery to argue that an equal protection claim exists because he has shown “an actual pattern of treating prisoners differently in ways that did affect the risk of pain to which they would be subjected, and therefore the risk of being subjected to cruel and unusual punishment.” 672 F.3d at 660 (discussing In re Ohio Execution Protocol Litig., 840 F.Supp.2d 1044, 1053-54, 2012 WL 84548, at *9 (S.D.Ohio Jan. 11, 2010), motion to vacate stay denied, 671 F.3d 601, 602 (6th Cir.2012)). This statement cannot be extracted from its context. The most significant part of the discussion preceded that statement: namely that a prisoner’s right to be free of cruel and unusual punishment “is not affected simply because that prisoner is treated less favorably than another, where one means of execution is no more likely to create a risk of cruel and unusual punishment than the other, and both are constitutionally available.” Id.[6]
Since each condemned inmate is physiologically different, no two prisoners would necessarily be similarly situated with respect to the siting of IV lines. While Lopez may be correct that the pain suffered by an inmate could depend on whether the Director elects to use a peripheral or femoral line, Lopez does not demonstrate that the Director has exercised his discretion in a manner that increases a prisoner’s risk of being subjected to an objectively intolerable risk of pain. Nor does he demonstrate that the Director has exercised his discretion in a constitutionally prohibited manner, for instance, based on a suspect or any other classification. The district court did not abuse its discretion in holding that Lopez fails to raise a serious question going to the merits on his equal protection claim.
III. Access to Counsel
In Towery, we stated that “[cjounsel for Towery and Moormann will be permitted in-person visits with their clients, including during the morning of the execution, under the long-standing ADC practice, as reflected in Department Order 710-IO-F (Nov. 5, 2004), § 710.02, *1077 ¶ 1.3.3.5.” 672 F.3d at 658. Our decision in Towery was expressly contingent upon the State’s representations and commitments made during the preliminary injunction hearing before this court. Id. Contrary to the Director’s assertion, Towery did not “incorrectly rely on a 2004 protocol referring to visitation.” Instead, we noted that the 2004 protocol — which permitted counsel visits up to 45 minutes — was representative of the ADC’s long-standing practice of permitting counsel in-person visits with clients, including during the morning of the execution.[7] Consistent with its representations to this court, the State permitted in-person non-contact attorney visits until 9:15 a.m. on the mornings of Towery’s and Moormann’s executions.
The ADC now claims that its representations in Towery were limited to the Moormann and Towery executions and did not waive the Director’s right to exercise his discretion with respect to the scheduling of future in-person attorney visits on the morning of a scheduled execution. In fact, for Kemp’s execution, the Director notified Kemp’s attorney that attorney visitation would be permitted from 6:00 a.m. until 7:00 a.m. on the morning of the execution; any subsequent contact would occur telephonieally and only within the discretion of the Director. The ADC has notified Lopez that a similar practice will be used for his execution.
We made clear in Towery that the State’s repeated ad hoc modifications to its written protocol — “through add-on practices, trial court representations and acknowledgments, and last minute written amendments” — is not sustainable. 672 F.3d at 653. Since the implementation of Department Order 710.09 in September 15, 2009, Arizona has incrementally, and without reason, imposed restrictions on in-person non-contact attorney visits on the morning of a scheduled execution. The 2012 Protocol, as written, permits the Director to preclude any in-person non-contact visits with counsel beyond 9:00 p.m. the day before the execution. Lopez is understandably concerned about what will actually occur in his case. While the State assured us at oral argument that the Director has no plans to deviate from his current practice of permitting attorney non-contact visits from 6:00 to 7:00 a.m. on the morning of the execution, we once again find ourselves evaluating a practice that is not, in fact, the written protocol.
The State cites confidentiality of the execution team and timeliness of the execution as concerns that justify the written prohibition. While confidentiality is a legitimate concern in the abstract, the State proffers no contemporaneous evidence of *1078 any breaches of confidentiality by defense counsel. See Cal. First Amend. Coalition v. Woodford, 299 F.3d 868, 880 (9th Cir.2002) (noting that defendants’ fear that execution team members will be publicly identified and retaliated against was an overreaction, supported only by questionable speculation). The State also fails to provide evidence that attorney visits led to delays in the execution. For example, Moormann’s execution started on time even though counsel was meeting with Moormann until 9:15 a.m. And prior versions of the protocol permitted non-contact visits up to 30 minutes before the execution. Thus, the State has failed to provide, and we cannot discern, any penological justification for the 9:00 p.m. cutoff on the day before the execution, nor for the 7:00 a.m. cutoff on the morning of the execution. Id. at 878 (“in reviewing a challenge to a prison regulation that burdens fundamental rights, we are directed to ask whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns.” (quoting Turner v. Safley, 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)) (internal quotation marks omitted)).
The difficulty with the State’s variable limitation on attorney visits on the morning of the execution is that an individual petitioner has no expectation baseline. The policy can change up to the last hour. Until the record is developed through trial and final resolution of the underlying litigation, counsel and the court are subject to the “rolling protocol.” Towery, 672 F.3d at 653. To stabilize the counsel visit protocol, as an interim temporary matter, pending trial and any subsequent appeal, we direct the Director to permit counsel in-person non-contact visitation until 9:00 a.m. on the morning of a scheduled execution.
The remainder of Lopez’s counsel challenge deals with having counsel observe the IV-placement procedure. The district court did not abuse its discretion in denying this request.
IV. Evidentiary Hearing
Lopez claims that the new evidence relating to the executions of Moormann, Towery, and Kemp tips the likelihood of success in his favor. As discussed above, the new evidence does not alter our conclusion that the district court did not abuse its discretion in denying Lopez’s motion for a preliminary injunction. See Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir.2010) (noting that this court reviews denials of evidentiary hearing requests for an abuse of discretion).[8] An evidentiary hearing was not required or warranted, and the district court did not abuse its discretion in so concluding. See Silva v. Woodford, 279 F.3d 825, 833 (9th Cir.2002) (noting that an evidentiary hearing is required where a defendant’s “allegations, if proved, would establish the right to relief.”).
Conclusion
The district court did not abuse its discretion in denying the injunction. Lopez’s emergency motion for a stay of execution is denied for the same reason.
AFFIRMED, subject to interim modification with respect to counsel visits. Motion for stay of execution DENIED.

. Some of the named plaintiffs have since been executed.

. The State has advised that it will use a one-drug protocol in Lopez’s execution. Lopez does not explicitly argue that the protocol is, in itself, unconstitutional. To the extent he indirectly makes this claim, it fails because he provides insufficient evidence to support such a claim.

. Lopez also challenges the pain related to puncture of the femoral artery and vein. Assuming that puncture of the femoral artery or arterial administration of the lethal drugs leads to pain, Lopez has not demonstrated that the increased pain meets the Baze standard, either in isolation or in combination with the other issues discussed here.

. This challenge is limited to the personnel the Director might hire to insert the peripheral IV lines. Under the 2012 Protocol, a medically-licensed physician must insert the femo *1075 ral central line. 2012 Protocol, Attach. D, § E.l ("In no event shall a femoral central line be used without being done by a medically-licensed physician.”).

. With respect to insertion of the lines, the log states: "Medical Team leader determined there is significant risk of adverse effects if the vein is defective. A central line was deemed necessary as a backup method to ensure the safest administration of the chemicals.” Five minutes later, the log reports that the left arm IV placement attempt failed due to "poor veins,” and that the right arm was designated as the primary line.

. Unlike Lopez's challenge, the In re Ohio Execution Protocol Litigation case involved challenges to deviations from the Ohio execution protocol by prison officials other than the Director, despite language in the Ohio protocol that the Director, and only the Director, could approve such deviations. 840 F.Supp.2d at 1053-54, 2012 WL 84548, at *9. Some of these deviations removed various procedural protections contained in the Ohio execution protocol — for example, requirements to review an inmate's medical chart— which arguably exposed the inmates to differing risks of pain depending on whether the written protocol was followed. Lopez’s argument, however, appears to be that the Director’s exercise of discretion under the protocol is itself unconstitutionally impermissible.

. See ADC Internal Management Procedure 500.4 (Feb. 4, 1986) § 4.4.5 (“Visits from the Attorney of Record and a Chaplain of condemned inmate's choice shall be permitted up to 'k hour prior to the scheduled time of the execution.”); Internal Management Procedure 500 (Mar. 10, 1993) § 5.Ó.3.6 ("Non-Contact Visits from the Attorney of Record and a Chaplain of condemned inmate’s choice shall be permitted up to two hours prior to the scheduled execution.”); Internal Management Procedure 500.4 (Dec. 24, 1994) § 5.2.1.2.4 (“Visits from the Attorney of Record and a Chaplain of condemned inmate’s choice shall be permitted up to one-half hour before the scheduled execution time.”); Department Order 710-IO-F (Nov. 5, 2004) § 1.3.3.5 ("Visits from the Attorney of Record and a Department Chaplain of condemned inmate’s choice are permitted up to forty-five (45) minutes prior to the scheduled execution.”); Department Order 710.09 (Sept. 15, 2009) § 1.6.2 ("The inmate's visitation privileges shall be terminated at 2100 hours the day prior to the execution, excluding non-contact visits with the inmate’s Attorney of Record and facility chaplain as approved by the Division Director for Offender Operations.”); Department Order 710.09 (May 12, 2011) § 1.5.2 (same).

. A doctor's speculation that Kemp’s shaking "suggests a partial seizure” caused by either the "medication administration, previous head injury or stroke, or a history of seizures,” is insufficient to raises a serious question going to the merits.