**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARL EUGENE CANNEDY, JR.,
*Petitioner-Appellee*,

v.

DERRAL G. ADAMS, Warden,
*Respondent-Appellant*.

No. 09-56902

D.C. No.
5:08-cv-01230-
CJC-E

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued February 16, 2011
Resubmitted January 22, 2013
Pasadena, California

Filed February 7, 2013

Before: Andrew J. Kleinfeld, Carlos F. Lucero,[*]
and Susan P. Graber, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Kleinfeld

---

[*] The Honorable Carlos F. Lucero, United States Circuit Judge for the
Tenth Circuit, sitting by designation.

# SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction of committing lewd and lascivious acts and attempting to dissuade the victim from reporting those acts.

Petitioner Earl Eugene Cannedy alleged that trial counsel provided ineffective assistance by failing to present evidence that the victim had made a potentially exculpatory statement supporting the defense theory that the victim had a motive to fabricate the allegations. The panel first held that it could not consider any evidence taken by the district court during an evidentiary hearing, and that its review was limited to the record before the California Supreme Court. *See Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). The panel next held that, based on the record before the California Supreme Court, that court unreasonably rejected Cannedy's ineffective assistance claim.

Judge Kleinfeld dissented. He would reverse the district court's decision because the California Supreme Court's decision could reasonably have been made by fairminded jurists, consistent with *Harrington v. Richter*, 131 S. Ct. 770 (2011).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Daniel Rogers, Deputy Attorney General, San Diego, California, for Respondent-Appellant.

Mark M. Kassabian, Buehler & Kassabian, LLP, Pasadena, California, for Petitioner-Appellee.

**OPINION**

GRABER, Circuit Judge:

Petitioner Earl Eugene Cannedy, Jr., stands convicted of committing lewd and lascivious acts upon his stepdaughter, and of attempting to dissuade her from reporting those acts to the police. The California state courts rejected Petitioner's direct and collateral challenges to his conviction. Petitioner then filed a federal habeas petition under 28 U.S.C. § 2254, arguing that he had received ineffective assistance of counsel. After an evidentiary hearing, the district court granted the petition. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A jury found Petitioner guilty of three counts of lewd acts upon a child, in violation of California Penal Code section 288(a), and one count of attempting to dissuade a witness from reporting a crime, in violation of California

Penal Code section 136.1(b)(1). Those charges stemmed from allegations made by Petitioner's stepdaughter, "A.G."[1]

At trial, A.G. testified that Petitioner had molested her several times in the winter of 2003, when A.G. was 13 years old. According to A.G., the first incident occurred when Petitioner kissed and licked A.G. on the lips while she was wearing strawberry lip gloss. The next incident took place about one month later, in December 2003. A.G.'s mother, Pia, was at work, and Petitioner and A.G. were watching a movie in the living room. Petitioner offered to give A.G. a foot massage but then moved his hands up A.G.'s leg, under her clothes, to her vagina. He touched the inside of her vagina with his finger. A.G. then went to her room and fell asleep. In the morning, A.G. did not tell her mother about the incident because she was confused and scared.

A.G. testified that the next incident occurred approximately two weeks later. A.G. was ill and was lying on the couch in the family room. Petitioner offered to give A.G. a back massage, and she accepted his offer. During the massage, Petitioner moved his hands under her pajamas and slid her underwear and pajamas down. He then pulled her hips up and put his mouth to her vagina. A.G. started crying, and Petitioner stopped what he was doing, apologized, and told A.G. that it would never happen again. A.G. went to her room and, when her mother returned home, A.G. did not mention Petitioner's behavior.

---

[1] We use the initials, rather than the names, of minors throughout this opinion. 18 U.S.C. § 3509(d); *see also United States v. Begay*, 673 F.3d 1038, 1040 n.4 (9th Cir.) (en banc) ("Because the victims were minors, we refer to them using only their initials."), *cert. denied*, 132 S. Ct. 754 (2011).

According to A.G., the final incident occurred on either Christmas day or the day after Christmas. On holidays, the children often joined Petitioner and his wife in their bed. A.G. went to her parents' bedroom, joined her parents and two sisters on the bed, and fell asleep. When she awoke, her mother was in the shower. Petitioner slid his hands down A.G.'s pants to the top of her underwear but did not touch her vagina. A.G. got out of the bed and went to her room. She did not tell her mother about the incident.

A.G. testified that the first person she told about the molestation was her boyfriend, B.R. Approximately a week after the foot massage incident, A.G. told B.R. that Petitioner had touched her inappropriately. A.G. recalled that her boyfriend wanted her to "tell" but that she did not want to do so. After the last incident, A.G. went to the San Francisco Bay Area to visit family. While there, she told her cousin about the molestation, but did not tell her aunt.

After she returned from the Bay Area, in early January, A.G. told her best friend, "L.M.," about Petitioner's inappropriate behavior. L.M. wanted A.G. to tell an adult, but initially A.G. refused. That weekend or the next week, L.M.'s mother Melanie picked the girls up from the mall. A.G. told Melanie what Petitioner had done. Melanie took A.G. back to Melanie's house and called Pia. Pia arrived shortly thereafter, and A.G. told her "everything that had happened." Pia was shocked and left to speak with Petitioner. A few hours later, Pia returned. By that time, A.G. had become sick and had a headache, so Pia suggested that A.G. return home. At home, A.G. saw Petitioner but did not speak with him.

A few days later, A.G. went to the emergency room. Before leaving for the hospital, A.G. testified that Pia and Petitioner had a talk with her about the allegations that she had made. A.G. stated that Petitioner told her that "we should just keep it in the family and that it—it's all over and it'll never happen again, just to forget about it and not tell anyone that it happened." A.G. further testified that Petitioner told her that if the police tried to speak with her about the molestation, she should deny that it had ever occurred. Petitioner said that if A.G. told the police, she and her sisters would be taken away and put in a foster home.

At the emergency room, A.G. spoke with several child protection agents and police officers. She denied being abused and said, "I love my step-dad. He'd never molest me, not in a million years." The next day, A.G. spoke with two child protection agents and first denied, but then admitted, that Petitioner had molested her.

On cross-examination, the defense pointed out several inconsistencies between A.G.'s testimony at the preliminary hearing and her testimony at trial. Those inconsistencies included A.G.'s earlier testimony that Petitioner had never put a finger inside her vagina, as well as other inconsistencies about details surrounding the alleged incidents of molestation. The defense also highlighted A.G.'s close relationship with her mother and questioned why A.G. would accept Petitioner's offer of a back massage and climb into bed with him after the first incident had allegedly occurred.

The prosecution called several witnesses to testify about what A.G. had told them, including B.R., L.M., Melanie, and Pia. Their testimony corresponded with the same basic narrative regarding A.G.'s disclosure of the molestation, but

there were several inconsistencies among the various witnesses' accounts. For example, B.R. repeatedly testified that, in early December 2003, A.G. had told him that Petitioner had warned her that she would be taken into custody by child protection services if she divulged the molestation. By contrast, A.G. testified that Petitioner had given her that warning in January 2004, right before she left for the emergency room. As another example, Melanie testified that when Pia returned from confronting Petitioner about A.G.'s allegations, Pia said that Petitioner had admitted the allegations and had assured Pia that he would sign over the house to her. Meanwhile, Pia testified that Petitioner had never admitted the allegations or offered to sign over the house and that she had told Melanie no such thing. Pia also testified that A.G. never directly told her that Petitioner had molested her.

The government also offered propensity evidence, admissible under California Evidence Code section 1108, concerning Petitioner's alleged sexual assault of Pia's sister, T.C. At the time of the trial, Petitioner had not been convicted of any crime related to that incident. Three government witnesses offered testimony regarding the alleged assault, and each of them provided a slightly different account of the incident. T.C. alleged that, while she was drunk, Petitioner had penetrated her vagina with a dildo. Pia and T.C.'s sister, Claire, testified that she received a call from Pia in which Pia stated that Petitioner was orally copulating with T.C. and asked Claire to come fetch T.C. from Pia's house. Finally, Pia testified that she never saw Petitioner assault T.C., but instead asked Claire to pick up T.C. because T.C. was drunk and acting inappropriately.

Petitioner testified as the sole defense witness. He denied ever molesting A.G. He also denied assaulting T.C., providing an account of the 2000 incident that largely corresponded with Pia's testimony. He hypothesized that A.G. might have harbored animosity toward him because he and Pia had planned to sell their house and move to Mountain Center, despite A.G.'s preference for living in the city. The defense theory of the case was that Petitioner was innocent and that A.G. had fabricated the allegations.

After seven days of testimony, the jury convicted Petitioner on three counts of lewd and lascivious conduct, but acquitted him of a fourth count, which pertained to Petitioner's alleged licking of A.G's lips. The jury also convicted Petitioner of attempting to dissuade A.G. from reporting the molestation to police and found true two special allegations of substantial sexual conduct with a minor under the age of 14. The trial court sentenced Petitioner to a term of 128 months' imprisonment.

After trial, Petitioner hired a new lawyer. Petitioner then moved for a new trial, grounded in part on his trial lawyer's alleged ineffective assistance of counsel. Specifically, Petitioner alleged that his trial lawyer, Mark Sullivan, "failed to present witnesses who could have corroborated [A.G.]'s motives for accusing [Petitioner] of molestation." Petitioner pointed in particular to a handwritten statement submitted by one of A.G.'s friends, a copy of which he filed with his motion, that read:

> The second week of February, I logged on the internet to talk to my friends. That day, I was talking to [A.G.], and I decided to look at her profile. To my surprise the profile said,

"To everyone whos reading this, the rumers that you've heard are wrong. I just wanted to move to my dads because everyone hates me, and I don't want to put up with it anymore. Everything you've heard isnt true. I just made it up, so I could get away from it all. I'm living at my dads where I have friends, and I am very happy. I'm at [L.'s house] right now, but I'm only going to be here for a day, so you can reach me at [L.'s house] if you want to talk."

Signed

[J.C.]

It is with my permission that this information be used and it is true and correct.

Mother of [J.C.]:  Jane [C.]

(Errors in original.)  The trial court denied Petitioner's motion for a new trial.

Petitioner appealed his convictions to the California Court of Appeal and, simultaneously, petitioned for a writ of habeas corpus from that court. In that petition, he raised the same ineffective assistance of counsel claim that he made in his motion for a new trial, and he requested an evidentiary hearing. As support for his claim, Petitioner submitted the handwritten statement that he had provided to the trial court. He also included with his petition a sworn declaration by J.C. It said:

I used to be one of [A.G.]'s best friends. I knew her for three and a half years, and knew her very well in those years.

Regarding the profile I alluded to in my statement that [Petitioner's lawyer] attached in support of [Petitioner's] motion for a new trial . . . , it was a buddy profile for AIM ([America Online] instant messenger). I found it while I was on the Internet instant messaging my friends. I think it was on the Internet to tell all of her friends/aquaintences [sic] why she had moved, and why she wasn't coming back.

In the profile, she stated that she made up the claims of molestation against [Petitioner] because she wanted to move to her natural father's home in Northern California where she was more happy and had more friends.

I would have testified at [Petitioner's] trial but his trial attorney did not subpoena me to testify. He never even talked to me.

Petitioner also submitted an email from Sullivan, which stated that he had discussed with Petitioner "the strategic pros and cons of calling . . . the many . . . witnesses whose names [Petitioner and his wife] gave [to him]." The email went on to state, "it was agreed that [it] would not be to our advantage to call . . . the . . . prospective witnesses in the trial."

The California Court of Appeal issued an unpublished opinion affirming Petitioner's convictions and denying the

writ. The court found Petitioner's ineffective assistance of counsel claim "too vague to warrant habeas relief" because "there is no allegation that trial counsel knew of the existence of [J.C.], the information on the Internet, or the time frame given for the alleged Internet information, and there is no documentary evidence." The court also observed that, at trial, Petitioner testified that A.G. got upset when he and A.G.'s mother put their house up for sale because A.G. did not want to move. Thus, the court reasoned, the away message's suggestion that A.G. *wanted* to move contradicted Petitioner's own testimony. "Accordingly," the court concluded, "we find that [Petitioner] cannot show either deficient representation or prejudice with regards to his [ineffective assistance of counsel claim]."

After the California Court of Appeal denied Petitioner's appeal and petition, Petitioner filed a petition for review and a mostly duplicative petition for a writ of habeas corpus in the California Supreme Court. For the first time, Petitioner submitted his own declaration, stating:

> Prior to my trial, I gave my trial lawyer, Mark Sullivan, names, addresses and phone numbers of all potential witnesses who could give favorable testimony in my behalf.
>
> Prior to my trial, I specifically told Mr. Sullivan about [J.C.] who was a friend of [A.G.]. I indicated that she could give favorable testimony in my behalf as to a motive for [A.G.] to falsely accuse me of the crimes for which I was charged. Contrary to Mr. Sullivan's assertion to my appellate attorney, I never agreed that there were no

available witnesses who could give favorable
testimony in my behalf. I was disappointed
Mr. Sullivan did not call any of my witnesses
to testify. I trust[ed that] he knew what he
was doing.

The California Supreme Court summarily denied the writ and
declined to review the court of appeal's decision.

Petitioner then petitioned the district court for a writ of
habeas corpus. The district court held an evidentiary hearing
on Petitioner's ineffective assistance of counsel claim. Six
witnesses testified.

First, J.C. and her mother both testified that they saw the
away message described in J.C.'s handwritten statement
during the second week of February 2003. Thinking that it
could be useful evidence, they wrote down the statement and
gave it to A.G.'s mother. Second, A.G.'s mother testified
that, before the trial, she gave Sullivan a copy of that
statement in a box of other documents. She also testified that,
during a meeting with Petitioner and Sullivan shortly before
trial, she handed Sullivan a copy of the statement and
Sullivan agreed to subpoena J.C. to testify. Petitioner's
former neighbor, present at that same meeting, corroborated
that testimony, saying that the statement was discussed
"intensely."

Next, A.G. testified that she did not write the away
message. She did not know who else could have written it
because she could not recall giving anyone else the password
to her America Online account and she had not stored her
password in any computer to which anyone could have had
access during the second week of February 2003.

Last, Sullivan testified that, three or four weeks before the trial, Petitioner mentioned a favorable posting that A.G. had made on the Internet. But Petitioner never could identify who saw it, and the issue eventually "seemed to fizzle."

The district court disbelieved Sullivan, crediting the other witnesses instead. The court held that J.C.'s testimony concerning the away message was admissible under state law through California's hearsay exception for prior inconsistent statements. The court also held that Sullivan's conduct was constitutionally deficient because "[e]vidence that A.G. recanted her molestation allegations to her friends was so significant and potentially exculpatory that any reasonable attorney would have sought to admit the evidence." The court concluded that Sullivan's deficient performance prejudiced Petitioner, because J.C.'s testimony "would have permitted jurors reasonably to conclude, or at least reasonably to suspect, that: (1) [A.G.] fabricated her allegations of molestation; and (2) [A.G. had a motive to fabricate those allegations because she wanted to move away. There exists a reasonable probability that such conclusion[s] or suspicion[s] would have raised in the mind of at least one juror a reasonable doubt as to Petitioner's guilt." The district court granted the writ, and the state timely appeals.

## DISCUSSION

We review de novo the district court's grant of habeas relief. *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008). Because Petitioner filed this petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996 governs review of his claims. *James v. Ryan*, 679 F.3d 780, 801 (9th Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3047 (U.S. June 28, 2012) (No. 12-11).

AEDPA imposes a "highly deferential" standard of review and "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

## A. *Cullen v. Pinholster*

As an initial matter, we must decide whether we may consider the evidence taken by the district court in analyzing Petitioner's ineffective assistance claim. We conclude that we may not; our review is limited to the record that was before the California Supreme Court.

After the district court granted the petition, while this appeal was pending, the Supreme Court decided *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). There, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398. Once a state court has decided the claim on the merits, "evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 1400.

Here, the California Supreme Court adjudicated Petitioner's ineffective assistance claim on the merits. First, the California Court of Appeal held that Petitioner had demonstrated neither deficient performance nor prejudice with respect to trial counsel's failure to introduce evidence concerning the away message. Then the California Supreme Court summarily affirmed. Therefore, we "look through" the California Supreme Court's decision to the last reasoned decision—that of the California Court of Appeal. *James*, 679 F.3d at 801. And we "treat[] the later [decision] as reaching the merits if the earlier one did." *Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012), *petition for*

*cert. filed*, ___ U.S.L.W. ___ (U.S. Jan. 16, 2013) (No. 12-885); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Accordingly, in conducting our own review under § 2254(d), we must limit ourselves "to the record that was before the state court that adjudicated the claim on the merits"[2]—the California Supreme Court.[3] *Id.*

## B. Ineffective Assistance

The state courts concluded that Petitioner had not demonstrated ineffective assistance of counsel. Under AEDPA,

> [f]ederal habeas relief may not be granted
> for claims subject to § 2254(d) unless it is
> shown that the earlier state court's decision
> "was contrary to" federal law then clearly

---

[2] We need not decide whether, under *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011), *cert denied*, 133 S. Ct. 155 (2012), we could stay and abey this case to allow Petitioner to present his additional evidence in state court. As we discuss below, even on the record before the state courts, Petitioner is entitled to relief.

[3] Although the California Court of Appeal also adjudicated the claim on the merits, it would make little sense to confine our review to the record that was before that court, especially where, as here, the record before the California Supreme Court was materially improved, in accordance with state law. Assuming that the California Court of Appeal's decision was correct on the record before it, confining our review to that record would produce the anomalous result of upholding an erroneous decision by the California Supreme Court on a fuller record because an inferior court's decision was correct on a less-developed record.

established in the holdings of [the Supreme
Court]; or that it "involved an unreasonable
application of" such law; or that it "was based
on an unreasonable determination of the facts"
in light of the record before the state court.

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citations
omitted). "[C]learly established law" refers to "the holdings,
as opposed to the dicta, of [the Supreme Court's] decisions"
at the time the state court decides the matter. *Stanley v.
Schriro*, 598 F.3d 612, 617 (9th Cir. 2010) (internal quotation
marks omitted) (alterations in original).

In evaluating the state's denial of habeas relief, we must
decide whether, considering only the evidence before the
state court, the determination that Petitioner received
constitutionally sufficient assistance of counsel was "an
unreasonable application of[] clearly established Federal law"
or resulted from an "unreasonable determination of the facts."
28 U.S.C. § 2254(d). "Under the 'unreasonable application'
clause, a federal habeas court may grant the writ if the state
court identifies the correct governing legal principle from this
Court's decisions but unreasonably applies that principle to
the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S.
363, 413 (2000).

Review of ineffective assistance claims under
§ 2254(d)(1) of AEDPA is "doubly deferential." *Knowles v.
Mirzayance*, 556 U.S. 111, 123 (2009). Unless there is a
Supreme Court case directly on point, "relief may be granted
only if the state-court decision unreasonably applied the more
general standard for ineffective-assistance-of-counsel claims
established by *Strickland*, in which [the Supreme Court] held
that a defendant must show both deficient performance and

prejudice in order to prove that he has received ineffective assistance of counsel." *Id.* at 122. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Thus, even if the state court arrived at what we think to be an incorrect result, that result must be upheld "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (internal quotation marks omitted).

"To establish that counsel provided constitutionally ineffective assistance, a defendant must demonstrate both deficient performance and prejudice." *James*, 679 F.3d at 807. If the state court reasonably concluded that Petitioner failed to establish either prong of the *Strickland*[4] test, then we cannot grant relief. Because the California Supreme Court summarily denied the petition, we must "look through" that judgment to the last reasoned state-court decision on the merits. *James*, 679 F.3d at 801. Here, the last reasoned decision is that of the California Court of Appeal.

The dissent argues that, after *Richter*, we should not "look through" a state high court's summary denial of a habeas petition to evaluate the reasoning that a lower court offered for denying a claim. Instead, the dissent would have us evaluate all the hypothetical reasons that could have supported the high court's decision. That view rests on an overly broad reading of *Richter*.

As this court has previously recognized, *Richter* addressed the effect of the California Supreme Court's

---

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

summary denial of an original petition for habeas corpus. *Williams v. Cavazos*, 646 F.3d 626, 635 (9th Cir. 2011), *cert granted*, 132 S. Ct. 1088 (2012). "The question in *Richter* arose because state habeas petitions in California are presented to the state supreme court as original petitions, rather than as requests for review of lower-court rulings denying relief . . . ." *Id.* at 635–36. In *Richter*, there was *no* reasoned decision by a lower court; there was no reasoned decision at all. 131 S. Ct. at 783. There was only a "one-sentence summary order" denying Richter's habeas petition. *Id.* In *those* circumstances, the United States Supreme Court held that "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary," *id.* at 784–85, and that a federal habeas court "must determine what arguments or theories . . . *could have* supported[] the state court's decision," *id.* at 786 (emphasis added). The Seventh Circuit has likewise recognized the limitation of *Richter*'s holding. *See Woolley v. Rednour*, 702 F.3d 411, 422 (7th Cir. 2012) ("[*Richter*] addressed a scenario where a conviction was upheld by a summary affirmance of the California Supreme Court. There was no 'reasoned opinion' by any lower court on collateral review. By its terms, [*Richter*] applies '[w]here a state court's decision is unaccompanied by an explanation . . . .' 131 S. Ct. at 784." (third alteration in original)). Accordingly, it does not follow from *Richter* that, when there *is* a reasoned decision by a lower state court, a federal habeas court may no longer "look through" a higher state court's summary denial to the reasoning of the lower state court.

The dissent correctly identifies *Ylst*, 501 U.S. 797, as the origin of the "look through" doctrine but fails to appreciate that the doctrine applies, even after *Richter*, outside its

original context. "Although the Court in *Ylst* was concerned with determining whether the state court had lifted a procedural bar to a claim by reaching the merits, the doctrine that a federal habeas court reviews the last reasoned state decision has been extended beyond the context of procedural default." *Barker v. Fleming*, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005). In fact, it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is "contrary to" or "an unreasonable application of" clearly established federal law. *See, e.g.*, *Mason v. Allen*, 605 F.3d 1114, 1119 n.2 (11th Cir. 2010) (per curiam); *Clements v. Clarke*, 592 F.3d 45, 52 (1st Cir. 2010); *Gonzales v. Mize*, 565 F.3d 373, 379 (7th Cir. 2009); *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008); *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007); *Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir. 2007); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006); *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003). *But see Tice v. Johnson*, 647 F.3d 87, 106 (4th Cir. 2011) ("Tice cites no instances of our having previously applied the 'look through' rule of *Ylst* where a state procedural bar is not at issue, and we have discovered none ourselves. We shall not embark on that journey today.").

We think it unlikely that the Supreme Court intended to disrupt this practice without making its intention clear. Moreover, we have continued, since *Richter*, to examine the last reasoned decision. In *Williams*, we explained the distinction between summary denials on the merits and summary denials of discretionary review. 646 F.3d at 635–36. Because denials of discretionary review are not decisions on the merits, we held that *Richter* does not affect our practice of "looking through" summary denials of discretionary review to the last reasoned state-court decision.

*Id.* at 636. But we intimated the possibility that *Richter* may affect our practice of looking through summary denials on the merits. *See id.* at 635 ("Following the Supreme Court's decision in [*Richter*], we continue to adhere to [the] practice [of 'looking through' summary denials], *at least with respect to cases in which state courts of last resort have exercised their discretionary authority to deny petitions for review*." (emphasis added)). A few months after *Williams*, we "looked through" a summary denial that apparently would have functioned as a denial on the merits under *Richter* had there been no reasoned state decision, and we examined the last reasoned decision. *See Hurles v. Ryan*, No. 08-99032, 2013 WL 219222, at *12 (9th Cir. Jan. 18, 2013) ("We focus our inquiry on [the] denial of Hurles's second [petition for post-conviction review], [because it] is the last reasoned decision by the state court on the judicial bias claim.").

In sum, we conclude that *Richter* does not change our practice of "looking through" summary denials to the last reasoned decision[5]—whether those denials are on the merits or denials of discretionary review. And, even if *Richter* does require us to consider hypothetical reasons that may

---

[5] The dissent also faults us for testing the reasonableness of the California Court of Appeal's decision by evidence that *was* before the California Supreme Court but was *not* before the Court of Appeal. But that is not what we are doing. We are reviewing the reasonableness of *the California Supreme Court's decision* by the evidence that *was* before it, and we are using the Court of Appeal's reasoning in accordance with our usual practice of "looking through" summary denials to the last reasoned decision. *See Hurles*, 2013 WL 219222, at *3, *12 ("looking through" a summary affirmance to examine the last reasoned decision by a state court). Had the state supreme court intended different reasoning because of the newly added facts, the court could have provided it. Although we recognize that the particular procedural history of this case makes it unusual, there is nothing "odd" about our adhering to our case law.

reasonably support the California Supreme Court's decision here, our review of the record discloses none that are consistent with that record.

### 1. Deficient Performance

The court of appeal rejected Petitioner's claim of deficient performance for several reasons. First, the court observed a number of evidentiary deficiencies in Petitioner's filing, namely that "there [was] no allegation that trial counsel knew of the existence of [J.C.], the information on the Internet, or the time frame given for the alleged Internet information, and there [was] no documentary evidence." Second, the court of appeal noted that the away message's intimation that A.G. wanted to leave town would have contradicted Petitioner's statement that A.G. did not want to move to the mountains with Petitioner and A.G.'s mother.

The critical inquiry under § 2254(d) is whether, in light of the evidence before the California Supreme Court—the last state court to review the claim—it would have been reasonable to reject Petitioner's allegation of deficient performance for any of the reasons expressed by the court of appeal. *See Richter*, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."); *Frantz v. Hazey*, 533 F.3d 724, 738 n.15 (9th Cir. 2008) (en banc) (noting that we must focus our analysis "on state courts' actual reasoning rather than hypothetical alternative lines of analysis"). The court of appeal first noted that "there [was] no allegation that trial counsel knew of the existence of [J.C.]." That deficiency was

corrected by the additional evidence that Petitioner submitted to the California Supreme Court; he submitted his own sworn declaration stating that he "specifically told Mr. Sullivan about [J.C. and] . . . indicated that she could give favorable testimony in my behalf as to a motive for A.G. to falsely accuse me." Accordingly, it was unreasonable for the California Supreme Court to reject Petitioner's claim on that ground.

The court of appeal also was incorrect when it stated that there was no time frame given for the away message. J.C.'s declaration plainly recites that she saw the away message during the second week of February. Thus, that part of the court of appeal's reasoning rested on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

Nor could the statement that no documentary evidence supported Petitioner's claim have justified the conclusion that his allegations of ineffective assistance were "without merit." Under California law, a habeas petition "should both (i) state fully and with particularity the facts on which relief is sought, as well as (ii) include copies of reasonably available documentary evidence supporting the claim, *including* pertinent portions of trial transcripts and affidavits or declarations." *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995) (emphasis added) (citations omitted). That passage suggests that declarations constitute "documentary evidence" that can support a petitioner's habeas claim. Thus, considering the evidence before the California Supreme Court, Petitioner supported his claim with documentary evidence, including his own declaration and J.C.'s declaration.

Even if the declarations submitted by Petitioner were "testimonial," rather than "documentary," evidence, that fact alone would not support the state courts' denial of Petitioner's ineffective assistance claim. *See Black's Law Dictionary* 640 (9th ed. 2009) (defining "testimonial evidence" as "[a] person's testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness"). In evaluating Petitioner's claim, the state courts had to determine whether the *allegations* contained in the petition, viewed in the context of the trial record, established a prima facie case of ineffective assistance of counsel. *See Pinholster*, 131 S. Ct. at 1402 n.12 ("The parties agree that the state-court record includes both the allegations of [the] habeas corpus petition . . . and . . . 'any matter of record pertaining to the case.' Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.' It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations and will also 'review the record of the trial . . . to assess the merits of the petitioner's claims.'" (internal quotation marks and citations omitted) (alterations in original)).

In Petitioner's submissions to the California Supreme Court, he made several important factual, not conclusory, allegations, including: (1) that J.C. saw an away message, written by A.G., retracting the accusations against Petitioner; (2) that Petitioner told trial counsel that J.C. could testify as to A.G.'s motive to accuse Petitioner falsely; and (3) that trial counsel failed to interview J.C. Those allegations are not contradicted by anything in the trial record, and they are supported by declarations from Petitioner and J.C.

The question for the state court, then, was whether those allegations sufficed to establish a prima facie case of ineffective assistance. *See In re Harris*, 855 P.2d 391, 397 (Cal. 1993) ("[O]ne seeking relief on habeas corpus need only file a petition for the writ alleging facts which, if true, would entitle the petitioner to relief."). The court of appeal clearly concluded that they did not, because it refused to grant Petitioner an evidentiary hearing and apparently declined to issue an order to show cause. *See Duvall*, 886 P.2d at 1258 ("If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]."). But the mere fact that Petitioner did not introduce, for example, a printout of the away message, does not mean that his allegations, if taken as true, failed to establish a prima facie case. And, as discussed below, the court of appeal's concerns about the sufficiency of those allegations were unreasonable.

The court of appeal concluded that Petitioner had not demonstrated ineffective assistance because: (1) Petitioner did not establish that he told his trial lawyer about the away message and (2) even if he had, the lawyer reasonably could have refused to introduce the message because it conflicted with part of Defendant's testimony. Under § 2254(d)(1), we must ask whether it would have been an unreasonable application of federal law for the state court to conclude, on those two grounds, that trial counsel did not perform deficiently. The *Strickland* standard is, itself, already deferential, requiring courts to "apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 131 S. Ct. at

787. Review of the deficient performance prong under § 2254(d)(1) is therefore "doubly" deferential. *Id.* at 788.

Here, the court of appeal correctly observed that Petitioner did not allege that he told trial counsel about the existence of the away message. But Petitioner did allege that "I specifically told Mr. Sullivan about [J.C.] who was a friend of [A.G.] I indicated that she could give favorable testimony in my behalf as to a motive for [A.G.] to falsely accuse me of the crimes for which I was charged." Thus, even assuming that trial counsel was not aware of the existence of the away message, the question is whether there is a reasonable argument that counsel's failure to contact J.C. *at all* did not amount "to incompetence under 'prevailing professional norms.'" *Id.*

No such reasonable argument exists. According to Petitioner's declaration, he told his lawyer that J.C., a friend of A.G.'s, could provide information about A.G.'s motive for falsely accusing Petitioner. Petitioner's trial was largely a "he said, she said" case, with no physical evidence linking Petitioner to the alleged abuse. Furthermore, Petitioner was the only witness to testify in his defense, and the defense's theory of the case was that A.G. had fabricated the allegations. Evidence that A.G. had a *motive* to implicate Petitioner falsely thus would have been vital to Petitioner's defense and consistent with the defense strategy. No competent lawyer would have declined to interview such a potentially favorable witness when that witness had been clearly identified, the witness was easily accessible and willing to provide information, and trial counsel faced a dearth of defense witnesses. On this record, counsel's failure to interview J.C. and to call her as a witness therefore cannot be excused as strategic. *See Thomas v. Chappell*, 678 F.3d

1086, 1104 (9th Cir. 2012) (noting that trial counsel's "failure to call [the witness] cannot be excused as a tactical decision because [counsel] did not have sufficient information with which to make an informed decision"), *petition for cert. filed*, 81 U.S.L.W. 3292 (U.S. Sept. 19, 2012) (No. 12-371); *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) ("Counsel's ineffective assistance . . . cannot be excused as strategic. He failed to conduct an investigation sufficient to make an informed judgment. To the extent that his decisions reflected any tactical considerations, his approach . . . cannot be considered an objectively reasonable strategy, even when viewed under the highly deferential *Strickland* standard."); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) ("Although trial counsel is typically afforded leeway in making tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision.").

The court of appeal's final remaining ground for rejecting Petitioner's allegation of deficient performance is that, even if trial counsel knew about the existence of the away message, he may have declined to present it because it contradicted some of Petitioner's testimony. But in his petition for review in the California Supreme Court—filed simultaneously with a petition for habeas corpus—Petitioner easily explained why there was no conflict between the away message and his testimony: "that [A.G. did not want] to move to Mountain Center did not mean that what she said on the Internet was not true. She might have preferred where she was living over moving to the mountains but still wanted to move to Northern California for the reasons [J.C.] indicated." That clarification illuminates that there was, in fact, no conflict—a child might not want to move away from home to

go live in town X with one parent while still wanting to move away to live in town Y with the other parent. Given that plausible explanation and the extremely high exculpatory value of the away message, it was objectively unreasonable to conclude that Petitioner's trial lawyer rendered effective assistance by declining to investigate or to introduce that evidence.

## 2. Prejudice

As noted, to prevail on his ineffective assistance claim, Petitioner must demonstrate prejudice as well as deficient performance.

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Richter*, 131 S. Ct. at 791–92 (internal quotation marks and citations omitted).

The California Court of Appeal rejected Petitioner's claim of prejudice, stating, "we find that [Petitioner] cannot show *either* deficient representation *or prejudice* with regards to his fourth claim of ineffective assistance." (Emphasis added.)[6] Thus, we turn to the question whether the state court's finding of no prejudice constituted an "objectively unreasonable" application of *Strickland*.[7]  *Williams*, 529 U.S. at 409.

"To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Thomas*, 678 F.3d at 1102 (internal quotation marks omitted).  The government argues that it was reasonable to conclude that Petitioner was not prejudiced by counsel's failure to introduce evidence of the away message because that evidence was inadmissible under state law.  Thus, we must first consider whether evidence of the away message could have been admitted at trial.  If the evidence could have been admitted, we must then ask whether there was a reasonable probability that it would have affected the outcome of the proceeding.

---

[6] The federal district court concluded that "[t]he state courts did not reach the issue of *Strickland* prejudice." *Cannedy v. Adams*, No. CV 08-1230, 2009 WL 3711958, at *31 (C.D. Cal. Nov. 4, 2009) (unpublished). That conclusion is incorrect.

[7] Because the state court of appeal's reasons for rejecting Petitioner's claim of prejudice are unclear, we have elected to treat the state court's prejudice determination as if it were unaccompanied by an explanation. Accordingly, we apply the stringent standard imposed by *Richter* and ask whether there is "any reasonable argument" that Petitioner was not prejudiced by counsel's deficient performance.  131 S. Ct. at 788.

For the away message to have a reasonable probability of affecting the outcome of the trial, there had to be a reasonable probability that a competent lawyer would have introduced evidence of the away message in an admissible form. *Wiggins v. Smith*, 539 U.S. 510, 535–36 (2003); *see also Riley v. Payne*, 352 F.3d 1313, 1323 (9th Cir. 2003) (considering the prejudicial effect of failure to introduce testimony where it was "probable" that such testimony was admissible under state evidence law). It does not matter whether the evidence would necessarily have been admissible in the specific form in which it was presented to the state courts on appeal or post-conviction review. What matters is whether a competent lawyer would have been able to introduce the evidence, in some form, at trial. *See Wiggins*, 539 U.S. at 535 ("[W]e find there to be a reasonable probability that a competent attorney, aware of this [evidence], would have introduced it at sentencing in an admissible form.").

By contrast, a failure to introduce evidence that is clearly inadmissible cannot be prejudicial, because there is no chance that the jury ever would have heard that evidence. *See Houston v. Schomig*, 637 F.3d 976, 980 (9th Cir.) ("The district court agreed with [trial counsel] that the polygraph results were not admissible without a joint stipulation. He noted that the prosecutor would not have consented. Thus, no adverse effect can be attached to this alleged failure."), *cert. denied*, 132 S. Ct. 297 (2011); *Stanley*, 598 F.3d at 620 ("No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial."). But that is not the situation here.

A competent lawyer likely would have been able to introduce the disputed evidence, the away message, in an

admissible form. Both parties concede, and we agree, that the substance of the away message would fall under the prior inconsistent statement exception to California's hearsay rule. *See* Cal. Evid. Code § 1235 ("Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."). The only question, then, is whether there is a reasonable probability that a competent lawyer would have been able to lay a foundation for the evidence.

Under California law, the bar for laying such a foundation is low. California Evidence Code section 403[8] provides that,

---

[8] California Evidence Code section 403 states:

(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:

(1) The relevance of the proffered evidence depends on the existence of the preliminary fact;

(2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony;

(3) The preliminary fact is the authenticity of a writing; or

(4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself.

to lay a foundation, trial counsel would have had to produce additional evidence "sufficient to permit the jury to find [that A.G. wrote the away message] by a preponderance of the evidence." *People v. Hinton*, 126 P.3d 981, 1020 (Cal. 2006); *see also People v. Marshall*, 919 P.2d 1280, 1297 (Cal. 1996) ("[T]he trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence, *even if the court personally would disagree*." (emphasis added) (citations omitted)).

There is a reasonable probability that a competent lawyer would have been able to produce evidence sufficient to permit a jury to find, by a preponderance of the evidence, that A.G. wrote the away message. J.C.'s declaration establishes from personal knowledge that the away message appeared on A.G.'s America Online Instant Messenger account. Competent counsel could have interviewed J.C. to find out

---

(b) Subject to Section 702, the court may admit conditionally the proffered evidence under this section, subject to evidence of the preliminary fact being supplied later in the course of the trial.

(c) If the court admits the proffered evidence under this section, the court:

(1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.

(2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists.

what she knew about A.G.'s use of instant messaging (including whether the style, grammar, and spelling of the away message were similar to those in A.G.'s other away messages); questioned Pia, Petitioner, and A.G. about A.G.'s use of instant messaging and whether her account was password protected; and determined whether A.G. had been staying "at [L.'s house]" when the away message was posted. The conclusion that such foundational evidence was available is bolstered by the fact that, at trial, Pia alluded to A.G.'s extensive use of an instant messaging account. Thus, there is a reasonable probability that a competent lawyer would have introduced evidence of the away message in an admissible form.

Once introduced, the evidence of the away message would have been the cornerstone of Petitioner's case. The message was powerful evidence that A.G. had fabricated her allegations of abuse. She stated that she "just made [the allegations of abuse] up, so [she] could get away from it all." It is difficult to imagine any evidence that could have been more exculpatory for Petitioner than the alleged victim's broad recantation of her accusations. Furthermore, at trial, the government introduced no physical evidence linking Petitioner to the abuse of A.G., and there were significant inconsistencies in the government witnesses' testimony. Meanwhile, Defendant served as the lone defense witness. The away message thus would have provided critical corroboration for Defendant's testimony and would have severely undermined the prosecution's case on the molestation charges.

Counsel's failure to introduce evidence of the away message also was prejudicial with respect to Petitioner's conviction for attempting to dissuade A.G. from testifying,

because it went to the heart of A.G.'s credibility.  A.G.
provided the only testimony from personal knowledge that
Petitioner had attempted, in January 2004, to dissuade her
from reporting the molestation to police.  Pia's account of
that conversation, at which she was present, differed from
A.G.'s in that Pia testified that Petitioner never told A.G. not
to tell the police about the molestation.  Petitioner also
testified that he did not warn A.G. not to tell police or
admonish her that she and her sisters could be sent to a foster
home.  Finally, the government's case on this count already
suffered from inconsistencies between A.G's testimony and
that of her boyfriend regarding the time frame for the alleged
dissuasion.  A.G.'s boyfriend testified that A.G. had told him,
in December 2003, that Petitioner attempted to dissuade her
from telling anyone about the molestation.  But, by A.G.'s
account at trial, Petitioner did not attempt to dissuade her
until January 2004.  The away message thus would have
corroborated the defense's theory that A.G. was not a credible
witness and that her account of Petitioner's actions and
statements could not be trusted.  Accordingly, a reasonable
probability exists that, had the away message been admitted,
at least one juror would have found Petitioner not guilty of
the dissuasion charge.[9]

---

[9] Furthermore, to obtain a conviction under California Penal Code
section 136.1(b)(1), the government must demonstrate that the person
whom the defendant attempted to dissuade was the victim of a crime. *See*
*People v. Upsher*, 66 Cal. Rptr. 3d 481, 488 (Ct. App. 2007) ("To prove
a violation of section 136.1, subdivision (b)(1), the prosecution must show
(1) the defendant has attempted to prevent or dissuade a person (2) who
is a victim or witness to a crime (3) from making any report of their
victimization to any peace officer or other designated officials."); Cal.
Crim. Jury Instruction 2622 (providing model jury instructions that
include as an element of the offense that the person the defendant
allegedly sought to influence was a crime victim).  The statute defines a

The dissent identifies two "problems" that Petitioner has in demonstrating prejudice: that a jury might not believe J.C. about what she saw on the Internet and that they might not believe A.G.'s recantation. Thus, the dissent argues that a fair-minded jurist could have concluded that putting J.C. on the stand probably would not have made a difference. But that argument sidesteps the critical question in determining prejudice: whether a fair-minded jurist could fail to acknowledge at least a reasonable probability of a different outcome. "*Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome . . . ." *Richter*, 131 S. Ct. at 792 (internal quotation marks and citation omitted). In a "he said, she said" case, such as this, it would have been objectively unreasonable not to acknowledge that *both* outcomes had a reasonable probability of occurring.

In sum, the state court's conclusion that Petitioner received constitutionally sufficient assistance of counsel constituted an "objectively unreasonable" application of the *Strickland* standard. *Williams*, 529 U.S. at 409. The state court's determination that counsel's performance was not deficient rested on unreasonable grounds, and no reasonable argument supports the state court's determination that Petitioner suffered no prejudice.

---

"victim" as "any natural person with respect to whom there is reason to believe that any crime . . . is being or has been perpetrated or attempted to be perpetrated." Cal. Penal Code § 136(2). Accordingly, to convict Petitioner under section 136.1(b)(1), the government had to demonstrate that A.G. was a victim. As discussed above, there is a reasonable probability that the evidence of the away message would have created at least a reasonable doubt as to whether A.G. had indeed been victimized by Petitioner.

Having concluded that the state court's decision was unreasonable, we "review the substantive constitutionality of the state custody de novo" to determine whether Petitioner suffered a constitutional violation entitling him to relief under § 2254(a). *Frantz*, 533 F.3d at 736–37. Largely for the reasons discussed above, we conclude that Petitioner received ineffective assistance of counsel. First, trial counsel performed deficiently. The defense theory of the case was that A.G. had fabricated her allegations. Defense counsel knew that J.C. could provide A.G.'s motive for doing so. Competent counsel would not have failed to interview such a potentially important witness or to introduce the significant exculpatory evidence that she could have provided. Second, counsel's deficient performance prejudiced Petitioner. It was reasonably likely that a competent lawyer could have introduced evidence of the away message in an admissible form. The prosecution's case rested on the jury's believing A.G.'s allegations, and its case was already weakened by inconsistencies in the government witnesses' testimony. Thus, had evidence of the away message been admitted, it was reasonably likely that at least one juror would have credited that evidence and concluded that a reasonable doubt existed as to whether A.G. fabricated her allegations. Accordingly, there is a reasonable probability that, but for trial counsel's deficient performance, the outcome of the trial would have been different. Petitioner's claim therefore meets the *Strickland* standard for ineffective assistance of counsel, and his petition for relief must be granted.

**AFFIRMED**.

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent. The California Supreme Court decision at issue could reasonably be made by fairminded jurists, so recent Supreme Court decisions require federal courts to deny the writ.

We are agreed that the record upon which the writ may or may not be granted is the record that was before the highest court of the state to have ruled on the issue, not the additional materials before the federal district court. The district court did not have the benefit of *Cullen v. Pinholster*[1] or *Harrington v. Richter*[2] when it granted the writ. *Richter* holds that a one sentence denial of the writ by the highest state court must be treated as an adjudication on the merits. Even when the "postcard denial" states no reasons, a federal court applying § 2254 "must determine what arguments or theories supported or, as here, could have supported" it, and then "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holdings in a prior decision of this Court."[3] Federal habeas relief under § 2254 "goes no farther," *Richter* holds, than that it "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."[4]

---

[1] *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

[2] *Harrington v. Richter*, 131 S. Ct. 770 (2011).

[3] *Id.* at 786.

[4] *Id.*

*Richter*'s sharp rebuke to our previous practice means that the writ must be denied. The majority suggests that because the California Supreme Court did not provide a reasoned opinion, we ought to test the California Court of Appeal's reasoning instead. Oddly, the majority thinks we should test the reasonableness of the Court of Appeal decision against evidence not presented until the case subsequently went to the California Supreme Court.

We do have Ninth Circuit decisions that say we "look through" summary orders of a state's highest court to the last reasoned opinion.[5] I question whether those cases are still good law, after *Richter*. Even if they are, the majority does not cite a single case where we reject the intermediate appellate court's reasoning based upon evidence presented not to it, but subsequently to the state supreme court. The origin of the "look through" is *Ylst v. Nunnemaker*.[6] That pre-AEDPA case does not support what the majority does here. *Ylst* instructs courts to "look through the subsequent unexplained denials to that [last reasoned] opinion, *unless* respondent has carried his burden of adducing strong evidence that one of the subsequent courts reached the merits of the federal claim."[7] *Richter* establishes that the California Supreme Court's decisions in this case were decisions on the merits, so there is no longer any need to "look through" to the lower court decision.[8]

---

[5] *See, e.g.*, *James v. Ryan*, 679 F.3d 780, 801 (9th Cir. 2012).

[6] *Ylst v. Nunnemaker*, 501 U.S. 805 (1991).

[7] *Id.* at 2596 (emphasis added).

[8] *Richter*, 131 S. Ct. at 784–85.

The majority interprets *Richter* by omitting the phrase "or, as here, could have supported."  *Richter* holds, not that we should evaluate reasonableness based upon "the reasons expressed," as the majority says, or merely "what arguments or theories supported" the California decision, but also what arguments "as here, *could have* supported the state court's decision."[9]  Now that we know from *Richter* that we should be reviewing the California Supreme Court's postcard denial as a decision on the merits,[10] and that we must leave it alone if there is any possibility that fairminded jurists could disagree with whatever arguments or theories "could have" supported it,[11] we have no justification for granting a writ because we reject as unreasonable arguments or theories articulated by a lower court.

*Cullen v. Pinholster*[12] holds that the proper scope of the record for federal habeas is what was before the state court, not what came subsequently into federal court.  "It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."[13]  This explanation by the Supreme Court is analogous to the majority's testing the California Court of Appeal decision

---

[9] *Id.* at 786.

[10] *Id.* at 784 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated' on the merits.").

[11] *Id.* at 786.

[12] *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

[13] *Id.* at 1399.

against facts not before it. A federal habeas petitioner "must overcome the limitation of § 2254(d)(1) on the record that was before that state court."[14] We are required to treat the California Supreme Court denial of the writ against the facts presented to the California Supreme Court.

Cannedy's evidence is a claim that J.C., a then-friend of the victim, and J.C.'s mother saw a message on the internet in which the victim said she had lied about Cannedy's sexual molestation because she wanted to move from her mother's and step-father's home to her father's home. I assume for purposes of discussion that this evidence would have been very helpful to the defense's attack on the victim's credibility, and that had the friend and her mother been called by the defense as witnesses, they would have testified to seeing the message.

The question before us is limited to whether Cannedy's trial lawyer rendered ineffective assistance of counsel by failing to interview the friend and put her on the stand. Pretty plainly, had he known about this evidence, and not known of some good reason not to use it, his conduct would have been hard to justify. The critical question is whether he knew or, at the minimal level of competence required by *Strickland*,[15] ought to have known, of this evidence.

A criminal defense lawyer would ordinarily not know the identities of a purported victim's friends or former friends, and would not know what the purported victim had posted on the internet. No one has claimed that the supposed posting is

---

[14] *Id.* at 1400.

[15] *Strickland v. Washington*, 466 U.S. 668 (1984).

still available on the internet, and no screen print has ever been submitted anywhere. No one has suggested that all Cannedy's lawyer had to do was Google the victim and check her postings on some specified online bulletin board to see it. Knowledge evidently depended on discovering, locating, and interviewing the victim's then-friend J.C.

What we have to do, under *Pinholster* and *Richter*, is examine the record before the California Supreme Court, and determine whether any theory or argument could have created a difference of opinion among fairminded jurists on whether Cannedy's trial lawyer rendered sub-*Strickland* assistance. And here is what we have. J.C. said the purported victim said in her posting she "just made it up," and J.C.'s mother said that was true. Neither said they had told Cannedy or his lawyer about the posting. No matter how helpful their message was, Cannedy's trial lawyer could not have used it if he did not know about it. The then-friend and her mother said that they knew the purported victim had recanted, but they never said that they told Cannedy's lawyer or Cannedy about the recantation.

In the state court, Cannedy never said in so many words that he told his lawyer what J.C. and her mother had to say, or their names. The record shows that Cannedy has had at least eight lawyers over the life of this case. He fired his trial lawyer after his conviction, and fired his subsequent lawyer after his motion for new trial, and fired his subsequent lawyer after his state habeas proceedings, so he has had plenty of legal assistance to make his statement as good as the truth would allow. He gave the California Court of Appeal J.C.'s statement and declaration, and correspondence among some of his lawyers, but he did not give the Court of Appeal any statement from himself. He did not tell the Court of Appeal

that he had told his lawyer who J.C. was and what she had to say. Perfectly reasonably, the California Court of Appeal did not assume that he had done what he did not claim to have done. It reasonably opined that there was "no allegation that trial counsel knew of the existence of J.C., the information on the internet, or the time frame given for the alleged internet information, and there is no documentary evidence." The majority performs the contortion of looking through the California Supreme Court decision to the prior California Court of Appeal decision, and deems it unreasonable based on what Cannedy never submitted to the Court of Appeal.

After losing in the Court of Appeal, once that court had told him what was wrong with his petition, Cannedy improved the record with an artfully shaped statement addressing the deficiency. Before the California Supreme Court, for the first time, he submitted a declaration that he gave his trial lawyer "names, addresses and phone numbers of all potential witnesses who could give favorable testimony in my behalf." In a subsequent paragraph he claims that he specifically told his trial lawyer "about" J.C. and "indicated that she could give favorable testimony in my behalf as to a motive" for the purported victim to make a false accusation.

Cannedy's declaration makes it sound as though he told his trial lawyer J.C.'s name, address, phone number, and that she would testify that the victim had recanted. But he does not quite say so. He could probably avoid a perjury prosecution if it were proved that he had never told his lawyer J.C.'s name and address, or just what she supposedly said she saw on the internet. After all, the "name, address and phone number" part of the declaration was in a different paragraph, and all he claimed to have told his lawyer regarding J.C. was "about" her and that she could testify about "motive."

Strikingly, even though his failure to declare that he told his lawyer J.C.'s name and what she would say was the basis for the Court of Appeal decision, he avoids saying in so many words that he did so.

Cannedy's trial lawyer of course was not a party to his state or federal habeas proceedings, so he lacked standing to file motions or submit evidence, and likely did not even know just what was happening in the case. We can glean something of what he said, though, from Cannedy's own submission of Cannedy's chosen communications involving his trial lawyer.

During the state habeas proceedings, long after the trial, when Cannedy's trial lawyer had long since given the file to his replacement, a subsequent lawyer wrote him asking whether he had talked to J.C., and summarizing the supposed testimony J.C. could have provided. Trial counsel told habeas counsel that Cannedy's previous lawyer had made frivolous claims against him about ineffective assistance and asked him to "take the fall" for Cannedy. He no longer had Cannedy's file, since he had turned it over to his replacement, but he did go over with Cannedy all the witnesses and they agreed that there were no more helpful witnesses.

Fairminded jurists could have reasonably concluded from the evidence in the California record that Cannedy did not tell his trial lawyer what this case turns on, J.C.'s name, how to find her, and that she would testify that the purported victim had recanted. A lawyer cannot be deemed to have rendered ineffective assistance for failing to discover a witness who whose identity, location, or observations he does not know anything about. Lawyers are not omniscient. Because fairminded jurists could (and did) so conclude, the federal

courts are not permitted, under *Richter* and *Pinholster*, to issue the writ.

This is not to say that fairminded jurists could not also reasonably conclude the opposite, that Cannedy told trial counsel and trial counsel failed to interview an important witness of whom he had been advised. The majority draws that inference, and it is not unreasonable. But neither is it inevitable. And it is the reasonableness of the California Supreme Court's decision, not the majority's, that controls.

So far, I have assumed for purposes of discussion that trial counsel's failure to interview and call J.C. was prejudicial. That is not necessarily so. To establish prejudice from deficient assistance of counsel, Cannedy "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."[16] Because a federal court can only grant a writ if the state court's decision went beyond error to unreasonableness, the question for us is not whether we think there is a reasonable probability that J.C.'s statement would have led to a different outcome. It is whether the California Supreme Court, even though it did not say so,[17] would have to so conclude.

Cannedy has two problems on prejudice, even if we assume for purposes of discussion that he told his lawyer J.C.'s name and address or enough to find her, and what she would say. First, a jury might not believe her. And second,

---

[16] *Richter*, 131 S. Ct. at 787 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

[17] *Richter*, 131 S. Ct. at 784–85.

they might believe her but not believe the purported victim's recantation. As for believing J.C. and her mother about what they saw on the internet, defense counsel's problem would have been that they had no screen printout. The handwritten record J.C. said she wrote down might, to the jury, seem more likely to be a subsequent fabrication than an accurate record, since it is easy enough to print out what is on the screen, and J.C. claimed it was so obviously important that she called her mother in to look at it. Of course we have no idea whether there might have been other impeachment, such as a spat between two girls who used to be close friends.

A jury might also have believed J.C., but not believed the victim's recantation. Sometimes true victims claim to have been lying when they made their accusations, to preserve a relationship that their true accusations would sever. Recantations are often viewed with skepticism by courts.[18] The jury might also have been skeptical. And the victim's accusations were supported by her aunt's testimony that Cannedy had molested her too when she was a teenager.

Jurors might have been skeptical about whether J.C. really read what she claimed on the internet, or whether the victim spoke the truth on the internet, or both. Thus a fairminded jurist could conclude that putting J.C. on the stand, even had counsel known of her existence, probably would not have made a difference. Certainly the defense case would have been a lot stronger had J.C. testified, assuming she appeared honest when she did. And defense counsel would have had a better argument to make about the victim's credibility. But that is as far as we can go, and it is not far enough to

---

[18] *See, e.g.*, *Ammon v. Wash. Dept. of Soc. and Health Servs.*, 648 F.3d 1020, 1031 (9th Cir. 2011).

surmount the deferential review we have to accord to the state court.

We should reverse the grant of the petition, because it was granted before *Richter* and *Pinholster* came down, and cannot withstand the force of those two decisions.